# JAMES J. GRAY vs. THE FARMERS' NATIONAL BANK OF ANNAPOLIS.

*Liability of Surety on Note—Delay in Proceeding Against Principal Debtor—Authority of Cashier of Bank—Renewal Notes.*

A bank cashier has no authority by virtue of his office to accept a new note for an existing indebtedness to the bank so as to discharge a surety on the first note, or to make a contract so to do.

A creditor does not lose his right to enforce the liability of a surety by mere delay to proceed against the principal debtor or to enforce a sale of property held as security for the debt.

Plaintiff was a surety on a note given to the defendant bank by A. The note was secured by a deed of trust of the property of A., the principal debtor, and was renewed from time to time, the plaintff signing the renewal notes until 1885, when he informed A. that he would no longer sign a renewal. The bank was notified of plaintiff's refusal, and, after the maturity of the last note signed by plaintiff, a renewal note was presented to the bank without plaintiff's name. This was declined and returned to A., and plaintiff informed thereof. Subsequently the bank agreed to renew the note without plaintiff, provided other security was obtained in his place, with the assent of the co-sureties, and interest and discount paid ; but no renewal note was in fact accepted. A. expected to renew the note, and deposited with the bank to his individual credit funds to meet the discount and interest. In 1886 the cashier, the note being overdue for nearly a year, made an entry on the books by which these funds were placed to the credit side of the bank's account as interest on the note. An action was brought on the last note signed by plaintiff and judgment obtained against him. Afterwards he filed a bill to restrain execution, alleging that he was ignorant at the time of the action of the facts concerning the renewal of the note. *Held,*

1st. That the bank did not in fact agree to release plaintiff except upon conditions that had not been complied with, and that plaintiff remained liable upon the last note signed by him.

2nd. That the bank had a right to apply the funds of A. deposited with it to the payment of the note *pro tanto*, and that the entry on the books by the cashier did not import the making of a contract for the renewal of the note without the plaintiff's name.

3rd. That if the entry on the books of the bank were to be construed as payment of interest on the note in advance, and an agreement to extend the time so as to discharge the surety, then the cashier had no authority to make such contract or entry, and his action in the premises had not been ratified by the directors.

Appeal from a decree of the Circuit Court for Anne Arundel County, in Equity (ROBERTS, C. J.), dismissing the appellant's bill of complaint. The case is stated in the opinion of the Court.

The cause was argued before ROBINSON, C. J., BRYAN, MCSHERRY, FOWLER, PAGE and BOYD, JJ.

*George R. Gaither, Jr.,* and *Harry M. Clabaugh,* for the appellant.

*James M. Munroe,* for the appellee.

PAGE, J., delivered the opinion of the Court.

In May, 1875, Dr. Benjamin R. Davidson applied through Judge Hagner to the Farmers' National Bank for a loan of nine thousand dollars. In April, of the same year, the Judge wrote to Dr. Davidson as follows: "I mentioned your matter at the board to-day, and I think it can be adjusted in this way: You all have a note there now for $3,800. The new note will include this, and will pay it off. It will be signed by Mr. J. Wilson Iglehart, as I understand, and some other surety, omitting Talbot. Then you will all execute a deed of trust to secure the payment of the entire indebtedness. This deed of trust can be made to sureties, or to some one else of your own selection;" and on the 28th of April, "the board has agreed to your proposition, except as to the length of time." In pursuance of this agreement, Dr. Davidson and George Davidson executed and delivered to the bank their note for the sum mentioned, payable six months after its date, with Jane Davidson, William G. Mackall, Sr., and John W. Iglehart as sureties ; and to secure the bank and the said sureties from all loss by reason

thereof, also executed a deed of trust to Judge Hagner, covering certain lands situate in Anne Arundel County. Judge Hagner prepared these papers, and it is insisted by the appellant that in so doing he was acting as the attorney for the bank.    The appellee denies this and affirms that though the Judge was at the time a member of the board of directors, he was not its attorney, but was in fact employed by the Davidsons.    In the views we shall express, we do not regard this question as at all material.    The note thus given was from time to time renewed, and on the nineteenth of December, 1884, Messrs. Iglehart & Mackall having died, Mr. Brashears and the complainant were accepted as sureties in their place.    On the fourteenth of July, 1887, the note being then overdue, the bank brought suit and obtained judgment on the seventh day of October, 1887, against all the parties, including the complainant, for $9,264.45 and costs.    On the eighth of March, 1893, the complainant filed his bill, in which he prayed that this judgment should be declared void as to him, and an injunction issued restraining the bank from taking any steps against him to collect the same.    In addition to the above facts, the bill alleges that the complainant signed the renewal note at the request of the Davidsons ; that the circumstances connected with the making of the loan, and "the fact that the bank held said deed of trust upon the property as primary security," were stated to him and "fully understood by him as a condition" for his so doing ; that in the early part of 1885 he informed the Davidsons he would "no longer place his name on the renewal notes," and that other arrangements must be made ;" that thereupon the said Davidsons presented to the said bank a renewal note for said loan without the name of the complainant, and he is informed the bank accepted the same, and received from them a discount for an extension of six months.    That when suit was brought on the note in 1887, he was falsely informed by the cashier that the renewal note had not been accepted, and in consequence made no defence, whereupon

judgment was rendered against him. The bill further alleges, that he urged upon the officers of the bank in frequent interviews, "the necessity for an immediate sale" of the property covered by the deed of trust, and the president agreed in the winter of 1889 that it should be sold in the following June, but despite this and other urgent requests on the part of the appellant, it remained unsold until December of 1891. That in meantime it had greatly depreciated in value, and taxes and interest had accumulated to such an extent that it failed by a large sum to bring enough to pay the claim of the bank. The defendant, in its answer, denies these charges, and in substance avers that the note upon which the suit of 1887 was instituted was the last ever accepted for the renewal of the original note for the Davidsons' loan, or upon which discount was paid ; that no note was ever accepted without the name of the complainant ; that until that suit was brought, no steps had been taken to enforce collection by law, and that when the appellant requested it to sell the property covered by the deed of trust, it was suggested to him to "pay off the note and take such steps as he deemed necessary." That by reason of the prospect of the speedy completion of the Drum Point Railroad, which then seemed reasonable, it was probable the lands would greatly enhance in value, and it would therefore be to the advantange of all parties to wait until the road was running ; and that the delay in advertising the property was due to that cause, the illness of Mr. Revell, and the necessity that arose for legal proceedings to bring in other parties.

The first question that arises, therefore, is, does the proof sustain the statement in the complainant's bill, that in January, 1886, the Davidsons presented to the bank a renewal note for another period of six months, without the name of the complainant, and, if so, did the bank accept it and receive the discount?

It appears from the proof that Mr. Gray notified Dr. Davidson that he would not be able to go on his note

again, by letter dated the 6th of March, 1885. The note
then outstanding with Mr. Gray's name on it as one of the
sureties, became due on the 22nd June. The directors
were made aware of Mr. Gray's refusal on the 12th
August, 1885. On that day, a note for renewal, without
Mr. Gray's name, was presented, declined by the board,
and returned by Mr. Randall to Dr. Davidson. Both the
Doctor and Mr. Gray were notified by letters, bearing date
the 12th August, 1885, of this action of the board, and
Mr. Gray was also notified that "unless the note, can be
renewed with your name or some other, considered equally
good, the whole business will have to be closed up, by
suit, against all the makers on the note, which we hold
overdue, yourself among the rest." To Dr. Davidson, the
president, after stating what had been done by the board,
concludes his letter of the 12th August as follows: " I
have informed Mr. Gray that the whole business will have
to be closed up by suit against him and all the others, &c.
*    *    Mr. Gray, no doubt, has just cause of complaint,
for there has been very little, if any, reduction of the note
for years, but he does not avoid responsibility by refusing
to sign a renewal note, for he is on the one which we hold.
I return the note" (that is, the renewal note), "and his
letter; please see him at once, and have the matter put in
shape." Dr. Davidson also sent to the bank, on June 25th,
two hundred and fifty-one dollars and eighty-seven cents,
whereupon the cashier addressed him a note stating he
"inclosed a blank for your note due 22nd inst. I credit
you $251.87; this will leave a balance still due on discount
of $11.40." This balance was probably paid to the bank
on July 28th, so that when the directors met on the 12th
August, while the money for the discount was to the credit
of Davidson with the bank, yet Mr. Randall distinctly
states that it was to the credit of the Doctor upon "the
individual ledger;" that is, as he explains, to his individual
credit, and, like any other deposit, subject to check. Mr.
Randall explains the course of business, in such cases, as

follows: "When a note has been running for more than one or two renewals, all sums deposited for discount or interest, by the person in whose name the note stands, or is carried on our books, is carried to the individual credit of that person on the individual ledger of the bank, like any other deposit made by him, and if the board of directors agree to renew the note when it is presented to them for renewal, the amount of the old note is charged to the individual and the proceeds of the new note is credited to the individual." The proof is conclusive that the action of the board on the 12th August was to positively decline renewing the note without Mr. Gray's name. After this, the matter seems to have rested until late in the year. On the 31st December, the president, in reply to a letter of the 29th, urges Dr. Davidson to take some action towards renewing the notes. He says, " it is absolutely necessary ;" " they can't be allowed to remain over longer ;" " the bank has certainly shown its anxiety not to distress you, and if you can give us two names as good as Gray's, as you say you can, and pay the back interest and discounts on the renewals, matters can go on for awhile, and you can have a chance to bring in your crops, &c." " I enclose you notes for renewal, and a mem. of back int. due and amt. of discount for renewals." Not receiving a reply to this, on 13th January Mr. Randall writes again : " I have heard nothing from you in regard to a renewal of the notes to this bank and substitution of two names in lieu of that of James Gray's, as proposed by you." He then refers to a letter from R. W. Templeman, asking, in the event of his loaning Davidson $8,500, if the bank would posptone its lien in his favor, and concludes: "The board has taken up the whole matter afresh, and in view of your efforts to improve matters and better prospects of avoiding a sale, which seemed inevitable, they now agree to renew your notes without Gray's name, and to let matters rest ; you, of course, paying all interest and discounts now due   *   *   *   I sent you notes ready for renewal, &c., and I want you to come up this week, without fail, and see

me and fix matters." To understand this letter properly, we must refer to the action of the board of directors. It appears from the letter of 31st December, cited above, that the president had written to Davidson in regard to a renewal of the notes and the substitution of two names in place of Gray's, and had sent him the notes "ready for renewal." As hinted at in the letter last cited, in which Mr. Randall used the words "in view of your efforts to improve matters and better prospects of avoiding a sale," it was then thought that Davidson would be able to effect a loan from other parties, and thus be enabled to make a payment to the bank, in which event the directors were willing that Mr. Gray should be released, provided the other sureties would assent. Mr. Randall in his testimony so states, and Dr. Davidson admits that it was understood at the time he received this letter, that the release of Mr. Gray was qualified by the necessity of securing other security in his place ; and among the proceedings of the board of the 13th January, appears the proposition of Dr. Davidson and the action of the board, as follows: " Proposition to renew his note in full without James J. Gray's name, all parties to note to agree in writing that the notes shall be renewed without Gray's name. Agreed to." What the meaning of this letter was, however, is not very important, for it is clear that no renewal was in fact accepted. The proceedings of the bank show that the subject was frequently before the board, and its repeated refusal to renew without the name of Mr. Gray. The correspondence makes it clear that the action of the bank was always a refusal to do so, except with the assent of the other sureties. On the sixth day of October, 1886, Mr. Randall, in writing to Dr. Davidson, said : "The board has assented to the renewal of the note without Mr. Gray's name, provided the assent of the parties to the note, particularly that of Mr. Brashears, was first obtained in writing. Yesterday Mr. Brashears was at the bank and informed us that he would not agree to renew the note unless Gray signed with him. To-day the board declined to re-

lease Gray and Brashears, and consequently you will have to take up the loan." Davidson himself does not say there was a renewal; in his testimony, he says, that in June, 1885, "the note was offered without Mr. Gray's name' and discount paid;" but in reply to the 37th and 38th cross-interrogatory, as well as in his letter of 3rd Sept., 1887, he explains that by stating that it was because he had sent in the note, and paid to the bank money for the discount; that he supposed that was the equivalent of accepting the new note, and thereby Mr. Gray was released. Mr. Randall, in his testimony, states most explicitly, that no renewal note was accepted after the 19th December, 1884; and in this, we think, he is corroberated by the overwhelming weight of all the evidence in the cause. It may be added, that it seems that Mr. Gray knew nothing of these transactions until September, 1887, when the summons was served on him to appear in the suit instituted by the bank. Thereupon he communicated with Dr. Davidson and received his reply bearing date the 3rd September. He has no information touching the alleged renewal, and does not testify upon the subject. By an amendment to his bill the complainant charges that the note was renewed without his name during the month of January, 1886. We are of opinion, however, that there was no actual renewal at any time, and the complainant is still bound as surety, unless he has been released, as will be hereinafter considered.

2nd. But it is contended that even if it be conceded that a new note was not accepted by the bank, in lieu of the note of the nineteenth of December, 1894, yet that Mr. Gray was discharged by the fact that the bank received the discount or interest in advance on the old note, after having been notified of Mr. Gray's refusal to have the note further extended. It was insisted that the letter of Mr. Randall, of 13th January, 1886, contains an express agreement to that extension. But we have shown that the expressions in that letter must be construed in the light of the existing circumstances, and meant only that the bank would release Mr.

Gray, provided the assent of his co-sureties could be obtained. It would seem, however, that Davidson expected to be able to renew the note, and for the purpose of having the funds ready to meet the discount, had at divers times deposited with the bank various sums, until on March 19, 1886, there was to his credit $485.10. These, as they were received, were placed to the credit of his individual account, according to the usual course of business as already explained. On that day, the note then being overdue (since the preceding June), the cashier made the following entry: "1886, Mar. 19th—Int. on note, $8,584.76; 11 months, 6 days int., $485.10," and placed the same upon the credit side of the bank's account with Dr. Davidson. This seems to have been done by him upon his own responsibility. Mr. Green, an officer of the bank, upon being asked by what authority it was made, replied, "that was made with the cashier. I suppose it was done just about dividend time; that note was almost due over a year, and I suppose he credited it up, and had that money due to his credit on his personal account." This sum was not received by the bank as discount, but merely, as we have seen, as a deposit of Davidson, and subject to his check, but to be applied as discount when a renewal note was accepted; and as it already has appeared, no such renewal note was accepted. The old note on the 19th March was still outstanding, and was long overdue. It was under these circumstances, within the right of the bank to apply it to the credit of the note, so as to operate as a payment *pro tanto* of what was due upon it. *Farmers' and Merchants' Bank* v. *Franklin Bank*, 31 Md. 412—and even if it be conceded that the cashier was invested with the power, *virtute officii*, to make such entries as would effect this result, yet it cannot be pretended that if in so doing he employed such terms as to import a new contract, by which an existing contract is abrogated, and a surety is discharged, the board of directors would be bound by such entry, unless the particular act was authorized, by the general

usage of the bank, or by special authority conferred upon the cashier, or confirmed by the acquiescence of the board made with a full knowledge of the facts.   There is not the slightest proof in the cause of any special authority having been conferred upon the cashier to make the entry, in the form in which it appears.   The by-laws are not in the record, but the learned Judge who decided the cause below has said in his opinion that these " do not authorize or justify *any* officer to accept notes and discount the same, in the summary method suggested ;" and Mr. Randall, the president, and Mr. Green, both testify that by the usage and rules of the bank, no officer has anything to do with the renewal of a note " that lies with the directors." It is well settled, that in *virtute officii*, a cashier has no power to discharge a surety.   *Savings Bk.* v. *Sailor*, 63 Mo. 24 ; *Merchants' Bk.* v. *Rudolf*, 5 Neb. 527 ; *Bank* v. *Haskell*, 51 N. H. 116.

In, the case of the *Chemical Nat. Bk.* v. *Kohner*, 8 Daly (N. Y.) 530, the law was stated as follows : " A cashier is the business officer of the bank, but only in the sense of one who transacts, and not one who regulates or controls its affairs.   His duty has reference to daily routine business, and not to matters involving discretionary authority, which belongs, unless delegated, to the board of directors ; as has been quaintly said, " they are the minds and he is the hands of the corporation   *   *   *   It will not be disputed that when a special authority is conferred upon him, or when he acts in conformity with a general usage, or an established acquiescene of his board of directors, the bank will be responsible for such acts, though beyond the ordinary scope of his duties." *The United States* v. *The City Bk. of Columbus*, 21 How. (U. S.) 356.   To the same effect was the ruling of this Court in *Ecker, Ectr.,* v. *First Nat. Bk. of New Windsor*, 59 Md. 303.   There JUDGE MILLER, speaking for the Court, said : " In our opinion, a cashier, as such, has no power to accept a note signed by two parties only, in payment and discharge of a note upon which another party was also bound, with the two, so as to release such third

party from his indebtedness to the bank ; such an act does not fall within the well-known range of powers and duties naturally and necessarily pertaining to the office of cashier. He cannot *virtute officii* release a surety upon a note, &c.
    *   *   But nothwithstanding the cashier has no power thus to bind the corporation   *  *   still it was competent for the directors to ratify his act, when it was communicated to them, and if they approved it, or with full knowledge acquiesced therein, the bank will be bound as effectually as if previous authority had been expressly delegated by them." There is no proof establishing the approval or acquiescence of the directors in the act of the cashier, so far as respects the particular form of the entry, or that it was in fact ever communicated to them. It is certain, however, that they acted all the time upon the hypothesis that nothing had been done or agreed upon to release Mr. Gray without the assent of his co-sureties. It is hardly presumable they would have continued to discuss the question of a renewal without his name, as late as the sixth of October, 1886, if they had acquiesced in the act of the cashier made in the March preceding, whereby Mr. Gray had been already released. Nor can their acquiescence be inferred from the retention of the money, for this they had the right to do, as we have seen. It is the particular application made by the cashier that is important, and not the retention. In the cases cited by the appellant, as in *The Peoples' Bk., &c.,* v. *Man. Nat. Bk.,* 101 U. S. 181, the bank obtained the money through the very transaction that it afterwards sought to repudiate. Here the bank received the money rightfully, and seeks only to repudiate the unwarranted act of the cashier, in so crediting it on its books, as to bind them to the making of a new contract, by which a surety will be discharged. On July 14th, 1886, and again on 6th October, 1886, they held meetings, and on both occasions declined to renew without Gray's name, and prior to either of these dates had taken the same action. In view of these facts, it seems difficult to understand how it can

appear that by a mere technicality, resulting from an unau-
thorized act of the cashier, the bank can be held to have
entered into a valid contract for a renewal, so as to disable
itself from suing upon the original note. Its repeated action
in declining to renew, can be considered in no other light
than a positive repudiation of the particular application of
the fund made by the cashier. The extension of time in
cases like this " is a question of mutual understanding and
intention, and like other contracts, the agreement of the
parties may be derived from and inferred by acts, declara-
tions, facts and circumstances." *Brooks* v. *Wright*, 13 Allen
(Mass.) 76 ; *Myers* v. *Wells and Magee*, 5 Hill, 463.

Nor do we find in the letter of the president of the bank
of the sixth of October, 1886, an implied confirmation of
the cashier's application. By the usage of the bank and by
the by-laws, as stated in the opinion of the Judge below,
no officer was authorized to bind the directors to such a
contract. Moreover, that letter was written seven months
after the entry was made, and in the same letter he informs
him that " to-day the board declined to release Gray,
&c." For these reasons we cannot hold that the note in
question has been renewed without Mr. Gray's name, or
that he is released by the effect of the entry so made by the
cashier, or by the dealings of the bank with the fund stand-
ing to the credit of Dr. Davidson at the time that entry was
made.

3rd. Another point raised by the bill and answer was,
that the bank having agreed in June, 1889, with Mr. Gray,
to foreclose the mortgage deed of trust, allowed two and a
half years to elapse before the sale, and, in the meantime,
by reason of the accumulation of taxes and interest, and of
the depreciation of the property, the proceeds of sale
proved insufficient to pay the debt. Of this, we may dis-
pose in a few words. It seems that Mr. Gray, in 1889,
offered to pay $2,500, provided he should be released, and
if this was not accepted, insisted upon a sale. The board
rejected the proposition to release him on these terms, but

decided to advertize the property, and so notified Mr. Gray by letter. There is much evidence in the record tending to prove the cause of the delay that ensued ; but we deem it unnecessary to advert to it, except to say that it does not appear that the bank ever took possession of, or assumed any control over the property. Stating the proof in its strongest aspect against the bank, its action amounted to no more than inaction or passive delay, and when that is the case, there is no impairment of the creditor's right to resort to the surety. *McShane* v. *Rodgers*, 73 Md. 155 ; *King* v. *Baldwin*, 2 Johnson's Chan. 555.

If the surety desires to expedite payment, he may pay the debt, and by that means put himself in the place of the creditor, or he may call on the creditor, by the aid of a Court of Equity, to proceed against the debtor upon giving the proper idemnity against costs and delay. *Freaner* v. *Yingling*, 37 Md. 497 ; *King* v. *Baldwin, supra.*

There were other questions discussed at the hearing and in the briefs of counsel, but we do not refer to them, inasmuch as it follows from what we have said that the decree appealed from must be affirmed.

*Decree affirmed.*

(Decided June 19th, 1895.)