FIRST NAT. BANK OF MANISTEE, MICH., et al. v. MARSHALL & ILSLEY BANK OF MILWAUKEE, WIS.

(Circuit Court of Appeals, Sixth Circuit. December 7, 1897.)

No. 474.

1. BANKS—REPRESENTATION BY CASHIER—ESTOPPEL.

The cashier of a bank does not act as its agent or representative in answering an inquiry addressed to him by another bank as to the business standing of a third person; and the bank is not bound or estopped by statements so made by him, his act being one not relating to the business of his bank, but simply one of customary courtesy, rendered without consideration.

2. SAME—ESTOPPEL BY ACTS OF OFFICERS—PRIORITIES OF LIENS.

The failure of the officers of a bank, in answering a general inquiry from another bank as to the character and standing of a customer, to disclose the fact that the customer was indebted to their bank, and that it held liens on certain of his property, will not estop it to assert such liens as against a mortgage subsequently taken by the inquiring bank, in the absence of any fraudulent intent.

Appeal from the Circuit Court of the United States for the Western District of Michigan.

Bill for foreclosure by the Marshall & Ilsley Bank of Milwaukee, Wis., against the Watervale Manufacturing Company, the First National Bank of Manistee, Mich., and others. From a decree postponing a lien held by the latter bank to complainant's mortgage, it appeals.

The original bill in this cause was filed to foreclose a mortgage executed in favor of appellee by the Watervale Manufacturing Company, conveying, besides other property, certain lots and a strip or parcel of land situated at Watervale, Mich., on which there is a sawmill and lumber plant, with pier and other improvements. The bill alleges that, at or soon after the date of execution of the mortgage in favor of appellee, it was discovered that the appellant claimed a lien on the same lots and parcel of real estate prior in time to the lien of appellee's mortgage. Appellant was made a defendant to the original bill, for the purpose of having appellant's lien postponed to the lien of appellee's mortgage, and this was the relief sought against appellant. After answer to the original bill, appellant filed a cross bill to foreclose the lien in its own favor, which was answered, and the question presented under both the original and cross bills is one of priority of lien on the same real estate. In the relief sought against appellant, the original bill proceeded upon the ground that appellant was precluded by estoppel from asserting priority for its lien as against appellee, the main facts being set out in the bill. Appellant is a banking association, organized under the acts of congress, and appellee is a state bank, formed under the laws of the state of Wisconsin. For convenience, appellant may be called the "Manistee Bank," and appellee the "Milwaukee Bank." On the hearing, the conclusion was reached by the circuit court that the lien of the Manistee Bank, though prior in date, ought to be postponed to the lien of the Milwaukee Bank; and it was decreed accordingly, and the case is brought here by appeal for review.

Hanchett & Hanchett, for appellant.

Dovel & Smith and Frank M. Hoyt, for appellee.

Before TAFT and LURTON, Circuit Judges, and CLARK, District Judge.

CLARK, District Judge, after making the foregoing statement, delivered the opinion of the court.

The estoppel urged against the Manistee Bank, and on account of which its lien was postponed, is predicated mainly on a letter written by Dunham, cashier of that bank, to Ilsley, vice president of the Milwaukee Bank, which is as follows:

"Manistee, Mich., Jan. 2, 1894.

"Marshall & Ilsley Bank, Milwaukee, Wis.—Gentlemen: In reply to yours of the 29th ult., would say Mr. Hale has a fine reputation as a competent, careful, and industrious business man. He has no bad nor expensive habits, but always gives his business the closest attention, and is very careful in his expenses. As near as I can judge, he has invested in his business about $40,000 above his indebtedness. Had lumber held up as well as it opened in the spring, I understand he would have cleared up nearly all of his indebtedness.

"Yours, truly, Geo. A. Dunham, Cashier."

The letter to which this was an answer was as follows:

"Milwaukee, Wis., Dec. 29, 1893.

"Geo. A. Dunham, Esq., Cashier, Manistee, Michigan—Dear Sir: Will you be kind enough to give us what information you can in regard to the character and financial standing of Leo F. Hale, of Watervale, which will be regarded as entirely confidential. Thanking you in advance, we remain,

"Yours, very truly, C. F. Ilsley, Vice Pres."

The inquiry was the result of an application for a loan made by the Watervale Manufacturing Company through Ellis, who presented a statement of the property and assets of that corporation prepared by Leo F. Hale, treasurer and general manager of the company. In this statement the real estate in question was included. In considering this letter and its effect, it becomes necessary to first determine whether it is to be treated as the letter of the bank, and affecting it as such, as seems to have been the view of the circuit court, and certainly the view presented by counsel for the Milwaukee Bank in argument at the bar. We are clearly of the opinion that Dunham cannot be regarded as acting for or as the agent of the bank in writing this letter. The acts and declarations of a cashier of a bank are binding on the bank, and affect it only when the cashier is in the discharge of his duty as such cashier, acting either in the general line of duty, or in regard to some business transaction with the bank pending at the time, and coming within his duty and authority. It is not insisted that there was any express authority conferred upon Dunham, cashier, to make voluntary answers of this kind to other banks, or the customers of other banks, although the practice of doing so is very common in the nature of the case. It is well understood to be a mere favor or courtesy, such as one banking institution extends to another. It was no part of the duty of Dunham, as cashier, to furnish such an answer as he did: and, not being a duty belonging to his position, there was no implied authority from the bank to do so. To require that the bank shall make good statements of this kind would be to impose on banks extraordinary liability for the acts of their agents, such as belongs to the relation of principal and agent in regard to no other line of business. To hold the bank liable for a mere voluntary statement made by its cashier, without

consideration, and having no relation to any business transaction with the bank, would be to subject the property of the bank to such risk as would tend to prevent the investment of capital in such an institution. We regard this question as now well settled by the adjudged cases. Horrigan v. Bank, 9 Baxt. 137; U. S. v. City Bank of Columbus, 21 How. 356–365; Mapes v. Bank, 80 Pa. St. 163–165; Bank v. Dunn, 6 Pet. 51, 59, 60; Bank v. Jones, 8 Pet. 12–16; First Nat. Bank v. Ocean Nat. Bank, 60 N. Y. 278, 291, 296. The same principle has been announced in many other cases, but we refer to only some of these, as follows: Gray v. Bank, 81 Md. 631, 32 Atl. 518; Bank v. Foote, 12 Utah, 157, 42 Pac. 205; Louisville Trust Co. v. Louisville, N. A. & C. Ry. Co., 43 U. S. App. 550, 22 C. C. A. 378, and 75 Fed. 433; Surety Co. v. Pauly, 38 U. S. App. 254, 18 C. C. A. 644, and 72 Fed. 470.

It remains to inquire whether this letter, taken in connection with the whole of the evidence in the case, establishes that the officers of the Manistee Bank, acting in the interest of the bank, have, by fraudulent misrepresentation or concealment, or both, misled the Milwaukee Bank into making a loan which it would not otherwise have made, in consequence of which it has or will sustain a loss. Such misrepresentation and concealment are the grounds alleged for the contention that appellant has, by equitable estoppel, lost priority for its lien of older date. This renders it necessary to go into the material facts at length. Stated in the order of time, these facts are as follows:

On the 16th day of December, 1892, Leo F. Hale was indebted to the Manistee Bank in a sum which may be stated as $18,000, the exact amount not being important. He had for several years been a customer of that bank, and transacting business with it. At that date, the president of the bank insisting that the debt should be in some way secured, Hale assigned to George A. Dunham, cashier of the Manistee Bank, two unrecorded land contracts made by William Vincent, in favor of said Hale, on which there was a balance of purchase money due of $2,500. These land contracts were assigned to Dunham, as security for the debt of Hale to the bank. On the 2d day of September, 1893, Hale made a bill of sale for the purpose of securing the same debt, in favor of the bank, of certain timber called "cedar stock," in boom, in and around Lake Herring. This bill of sale was made in favor of the bank at the request of Hale, in order to release certain stock in the South Arms Lumber Company, then held as security for the same debt. This bill of sale was not filed for record in the office of the clerk of the proper township, as required by the law of Michigan, until June 7, 1894. On the 21st of December, 1893, pursuant to an understanding with Hale, the Manistee Bank paid to Vincent the balance due on the land contracts; and Vincent made deeds for the land to Dunham, cashier of the bank, absolute in form, but in trust as security for the debt before mentioned, and the further amount thus paid to Vincent. These deeds were not recorded as required by the law of Michigan until June 23, 1894; so that, from the time the contract of sale was made between Vincent and Hale, the record title remained in Vincent until the deeds from Vincent to Dunham were put on record, June 23, 1894, as before stated. In explanation of the

delay in filing the bill of sale for the cedar stock in the proper office, Dunham, cashier of the bank, states that the bill of sale was filed away at a proper place in the bank office, and overlooked until about the date when it was filed in the office, viz. June 7, 1894. In explanation of the delay to have the deeds from Vincent to Dunham recorded, the president of the bank says that taxes were due from Hale on the land, which Hale promised to pay, and, when paid, to give notice, so that these deeds might be recorded; it being required under the law of Michigan that all taxes should be paid on land before a deed therefor could go on record. The president of the bank states that the deeds were recorded as soon as notice was given by Hale that the taxes had been paid, and says, further, that the deeds were withheld from registration for no other reason, and with no other purpose or motive. Hale was a lumber merchant and manufacturer, and seems to have transacted a large business, borrowing considerable sums of money from time to time, and during the year 1893 was considerably pressed for money with which to carry on his business and meet his debts as they matured. He was at various times during that year indebted considerably to persons and companies other than the Manistee Bank, and these general facts were no doubt well understood, at least in a general way, by the officers of the Manistee Bank. Charles H. Ellis, a lumber commission merchant, of Milwaukee, Wis., had handled much, if not all, of the product of Hale's plant at Watervale. He had been doing business with Hale for several years, and was well acquainted with him.

In November, 1893, negotiations were set on foot between Hale, William M. Williams, and Fred E. Mansfield, of Milwaukee, through the aid of Ellis, for the purchase by Williams and Mansfield of a half interest in the sawmill plant at Watervale. During the time over which these negotiations extended, and early in December, 1893, Hale, Williams, Mansfield, and Ellis met T. J. Ramsdell, president of the Manistee Bank, at the Buckner House, in Manistee, where the general subject of the negotiations was mentioned. Among other things, it was stated to Ramsdell that Williams and Mansfield were about to purchase an interest in the Hale sawmill plant, and could or would do so, provided the Manistee Bank would take a mortgage for $24,000 on property at Milwaukee, which mortgage Williams, or Williams and Mansfield, proposed to transfer to the Manistee Bank in payment of Hale's indebtedness to that bank. It was arranged that Ramsdell should go to Milwaukee, make an examination, and determine whether the Manistee Bank would take the mortgage. While Ramsdell was at Milwaukee, an interview occurred between him and Ellis at the Plankinton House, in which Ellis states that he made specific inquiry of Ramsdell about Hale's property, and whether the bank had any lien or claim on the real estate, and that Ramsdell stated that the bank had no lien on the property. This statement is directly and positively denied by Ramsdell, who says no such statement was ever made, nor anything in substance or effect like such statement. After his return to Manistee, Ramsdell, president of the Manistee Bank, reported that the Milwaukee mortgage was not satisfactory, and would not be accepted by the bank. Hale, Williams, and Mansfield went to Manistee,

and had a second interview with Ramsdell at his office, on the 27th of December, 1893. The subject of Hale's indebtedness to the bank was then discussed, but there is a conflict in the testimony as to what was said and what occurred on that occasion. It is, however, not disputed, that the effort on the part of Hale, Williams, and Mansfield was to arrange with the Manistee Bank either to pay Hale's debt to the bank, or to so secure the debt that the bank would not press its collection. Ramsdell states that he said to Williams that the bank had just paid $2,500 to Vincent to obtain title to the property on the contract from Vincent to Hale, which had been assigned to the bank, and that the bank ought to have that amount paid at once, which Williams said could be paid by January 15, 1894. Ramsdell says that he then prepared and handed to Williams a memorandum showing the amount and date of payments which would be satisfactory to the bank, a copy of which is as follows: "$2,500, due February 1, 1894; $6,500, due June 1, 1894; $6,500, due January 1, 1895. Stock of cedar to be held by us until January payment of 1895 to be met." "And I signed my name to it,—T. J. Ramsdell. I made a memorandum on the same pad." Mansfield, Williams, and Hale then returned to Watervale, and on the 28th of December, 1893, Williams and Mansfield purchased a half interest in Hale's plant, and formed the corporation known as the "Watervale Manufacturing Company"; and on the same day Hale conveyed to that corporation practically all of his Watervale property, real and personal, including the real estate now in controversy, but conveying this real estate by quitclaim deed only. Mansfield and Williams agreed to pay Hale, for a half interest in the property, the sum of $30,000. The capital stock of the Watervale Manufacturing Company was fixed at $75,000, and $60,000 of the stock was treated as paid up by the property conveyed by Hale to the manufacturing company. Accordingly, $30,000 of paid-up stock was issued to Mansfield and Williams, and a like amount to Hale, and the corporation was duly organized by the election of Williams, Hale, and Mansfield as officers. Williams and Mansfield executed to Hale their notes, which amounted in the aggregate to $30,000; and $22,000 of these notes were transferred by Hale to the Manistee Bank, as further security for its debt against Hale, with the agreement that any sums paid on such notes should be credited on the bank's debt against Hale, and also on Williams' and Mansfield's notes. On the same day that the corporation was organized, viz. December 28, 1893, and on which Hale conveyed his property to that corporation, a contract was executed between Hale and Williams and Mansfield, a copy of which is in evidence, and is as follows:

"We, Williams and Mansfield, do hereby agree to and with Leo F. Hale to pay to the First National Bank of Manistee, Mich., the following amounts. as hereinafter stated, viz.: On or before February 1, 1893, $2,500; on or before June 1, 1894, $6,500; on or before January 1, 1895, $6,500; on or before January 1, 1896, $6,500,—and, upon the payments of the said sums as stated, the said sums are to be indorsed upon our notes for like amounts, bearing date of this agreement, and due as before mentioned at said bank, but drawing interest at the rate of six per cent. per annum. Leo F. Hale agrees that upon the payment of the said amounts to said bank, as stated, to make indorsements as stated upon the said notes, and when the entire sum of twenty-two thousand dollars ($22,000) is fully paid, to deed by warranty deed the property now

held by First National Bank of Manistee, Manistee, Mich. (as security for his obligation to them), to the Watervale Manufacturing Company, this day organized.

"Williams & Mansfield.<br>"Leo F. Hale."

In this connection it should be stated that the first, second, and third of the notes executed by Williams and Mansfield to Hale, and transferred by Hale to the bank, correspond exactly in date of payment and amount with the first, second, and third payments mentioned in this contract, and in like manner correspond with the first, second, and third payments in the memorandum which Ramsdell says he furnished Williams at the interview in Manistee, on December 27, 1893. The bearing of this agreement as to dates and amounts will be noticed further on. On the next day after the formation of the corporation, to wit, December 29, 1893, Ellis made application to the Milwaukee Bank for a loan in favor of the Watervale Manufacturing Company, explaining to the vice president, with whom the loan was negotiated, that he desired it in order that the manufacturing company might purchase timber, and work it up during the winter for the market in the spring and summer following, and stating, further, that he was handling the product of the manufacturing company, and expected to repay the loan out of the proceeds of sales of the product to be made by him. Hale had prepared a statement of the assets of the manufacturing company, which included the real estate covered by the deeds from Vincent to Dunham, and by quitclaim deed from Hale to the manufacturing company, and this was presented by Ellis to Ilsley in the negotiations for loan. Ellis explained to the vice president of the bank, Charles F. Ilsley, that he had known Hale for some years, and that he regarded him as an honorable, responsible, and excellent business man. Ilsley says, after putting various questions to Ellis in regard to the property of the Manufacturing Company, that he told Ellis he would write to the Manistee Bank, and that, if what Ellis said was in a measure corroborated by that bank, he thought the loan would be made. On the 29th of December, 1893, Hale was notified by telegram from Williams that a letter had been written to the Manistee Bank, the telegram indicating that the Milwaukee Bank had written to Ramsdell. A letter is put in evidence as written by Hale to Williams on the 29th day of December, 1893, in which Hale, after acknowledging that the telegram had been received, says:

"On receipt of same, this a. m., I wrote Mr. Ramsdell, fully stating what we had done to organize the company, etc., and went over everything, and asked him to put no cold water on the matter, and I take that letter to Frankfort with me this a. m. I will mail it the same time I do'this, so it goes out this afternoon. I wrote you this morning, mailing papers you left, etc. Now, I hope money matters will be all right, and that I shall know soon, as you know my position, I think, fully, and do not wish to get embarrassed on the start. I gave Ramsdell the same statement I gave you in details, etc.; so that he would act understandingly. Now, should you send telegram in the morning before 10 o'clock, send it to Pierport, Mich.; if after that time, send to Frankfort, Mich.

"Yours, very truly,                                      Leo F. Hale."

It is also disclosed by the record that on the same day Hale wrote Ellis, stating, in substance, the same thing as was stated in the above letter to Williams. Ramsdell denies that he ever received

any such letter from Hale as indicated in the foregoing letter to Williams, and Hale, on being pressed on cross-examination, declined to say whether he in fact wrote such letter to Ramsdell, and says, in substance, that he might have done so, or that he might have changed his mind, and concluded not to do so.    It is further brought out in testimony that Hale had a letterpress copy book in which at that date he was in the habit of copying such personal letters as it was thought important to preserve.    This book is not produced in evidence, although called for on cross-examination, and although five or six other books which had been previously used were produced. Mr. Hale says this particular book was kept with the other books, and that he is unable to find it after making search for it.    It is not quite clear whether the cedar stock covered by the bill of sale to the Manistee Bank on September 2, 1893, was excepted from the conveyance from Hale to the manufacturing company.    It is not important now to consider how this was.    On the 29th of December, 1893, Mr. Ilsley, vice president of the Milwaukee Bank, made inquiry in regard to Hale, by letter addressed to the cashier of the Manistee Bank.    This letter, with Dunham's answer, has already been set out. Ilsley testifies that, on receipt of this letter from Dunham, he agreed with Ellis to loan the Watervale Manufacturing Company a sum not exceeding $15,000.  He states very distinctly that in making the loan he relied upon the statement of the property of the Watervale Manufacturing Company, as prepared by Hale, and furnished through Ellis, together with what Ellis said as to the reputation and financial standing of Hale, as well as what was said in this letter from Dunham on the same subject.    He says that the letter of Dunham was the final statement on which he decided to make the loan.    Between the 8th of January, 1894, and the 7th of May, following, the bank had loaned to the Watervale Manufacturing Company the sum of $25,000.    Notes were taken, signed by the Watervale Manufacturing Company, with a written guaranty of payment of each note, signed individually by Hale, Williams, Mansfield, and Ellis.    Ilsley states that, when application was made for a loan above $15,000, he called attention to the fact that the loan was, according to the agreement, not to exceed $15,000, but says that, after full consideration of the matter, he thought the best method to secure the payment of what was already loaned was to make a further loan of money. Payments have been made on this indebtedness until now there remains a balance of $17,000 of principal.    On the 9th of July, 1894, it became evident that the business of the Watervale Manufacturing Company was in very unsatisfactory shape, and not being successfully prosecuted; and thereupon, after proper steps taken, two mortgages were executed in favor of the Milwaukee Bank,—one covering the real estate, and the other the personal property, of the Watervale Manufacturing Company.    A demand note was then executed for $23,000, the balance then due to the Milwaukee Bank.    Demand was made, and on the 4th of August, 1894, the original bill was filed by the Milwaukee Bank in the court below, to foreclose these mortgages, and for the appointment of a receiver.    It was alleged that the Milwaukee Bank had just recently discovered the fact

of the existence of the deeds to Dunham, as well as the bill of sale of the cedar stock to the Manistee Bank, that stock having been included in the chattel mortgage executed by the Watervale Manufacturing Company to the Milwaukee Bank.    The bill, as we have seen, sought to have the lien of the mortgage of July 9, 1894, declared prior to the lien held by the Manistee Bank, upon the ground that the officers of the Manistee Bank had fraudulently combined with Hale to aid him to obtain a loan in order that he might thereby be enabled to pay his indebtedness to the Manistee Bank, and that it was in aid of this purpose that the deeds were withheld from registration, and the bill of sale not filed as required by law.    The pleadings are sufficient to admit of the further contention now made in argument that, if the proof does not sustain the charge of a fraudulent combination, nevertheless the officers of the Manistee Bank were aware of the loan which the Milwaukee Bank was about to make to the Watervale Manufacturing Company, and had knowledge that Hale had included the real estate covered by the Vincent deeds, as well as the cedar stock in the statement prepared of the assets on which the loan was obtained, and that, under such circumstances, it was the duty of the bank to make known the fact of its lien, and, having failed to do so, it is precluded by estoppel from now claiming priority for its lien.    The bill was answered by the Manistee Bank as well as the Watervale Manufacturing Company, the Manistee Bank denying all charges of fraud and collusion, and distinctly denying all knowledge of the proposed loan from the Milwaukee Bank, and also denying all knowledge of the fact that Hale had included the real estate in any statement of assets of that company.

It should be stated that there is here no longer any question for determination in regard to the bill of sale.    After the Milwaukee Bank had taken possession of the property covered by the bill of sale, an action of replevin was instituted in the state court for possession of that property, which resulted in a judgment in favor of the Manistee Bank, and the judgment was on writ of error affirmed by the supreme court of Michigan.    The contention in that case was that the Manistee Bank, not having filed its bill of sale in the proper office, so as to give public notice, was under duty on the facts to make known the fact of its lien, and that, not having done so, it had waived its right to claim the lien as against the Milwaukee Bank. An attempt was made to show that the Manistee Bank had knowledge of all of the facts by reason of the letter of inquiry to Dunham, as well as the letter which Mr. Hale said in the communication to Williams had been written to Ramsdell, president of the bank.    In regard to this contention, the supreme court of Michigan said:

"It is insisted that it was the duty of the plaintiff, in reply to the letter to the defendant inquiring as to the character and financial standing of Mr. Hale, to state the indebtedness of Mr. Hale to it.    There might be circumstances where this would be required.    This letter, however, contained no intimation that the defendant bank was intending a loan to Mr. Hale.    In fact, it contemplated a loan to the corporation, and made the loan to it, but no intimation of this purpose is found in the letter.    In order to create an estoppel in pais, it must appear that the party making the representations

knew or was informed that the party to whom they were made intended to rely upon them. The rule applicable to this case cannot be better stated than it was by Lord Campbell, in Howard v. Hudson, 2 El. & Bl. 10: 'If a party willfully makes a representation to another, meaning it to be acted upon, and it is so acted upon, that gives rise to what is called an "estoppel." It is not quite properly so called, but it operates as a bar to receiving evidence contrary to that representation, as between those parties. Like the ancient estoppel, this conclusion shuts out the truth, and is odious, and must be strictly made out. The party setting up such a bar to the reception of the truth must show that there was a willful intent to make him act on the faith of the representation, and that he did so act.' Boyd v. Stone, 11 Mass. 349. See, also, Hyde v. Powell, 47 Mich. 156, 10 N. W. 181; Heyn v. O'Hagen, 60 Mich. 150, 26 N. W. 861; Pearson v. Hardin, 95 Mich. 369, 54 N. W. 904; Pierce v. Andrews, 6 Cush. 4; Freeny v. Hall (Ga.) 21 S. E. 163; Meisel v. Welles (decided at the present term) 65 N. W. 289, where the meaning of the term 'willful' is discussed. No statement of liabilities was called for, but only his character and financial standing as a business man. Banks, as well as individuals, frequently write for information of this character. Business men of the highest standing and credit often obtain loans at banks for carrying on their business. When an inquiry comes to such bank asking simply for the character and financial standing of the merchant, the bank is not bound at its peril to report any loans which such merchant may have at its bank. Banks, too, often make such inquiries, not for themselves, but for their local customers. The plaintiff was not therefore, as a matter of law, estopped by his letter in this case. The entire question was submitted to the jury, under instructions very favorable to the defendant. Error is assigned upon that portion of the instructions above stated in regard to the statements found in the letter of Mr. Hale of December 30, 1893, to Mr. Williams, and to the letter of Mr. Dunham, the cashier, to Mr. Ilsley. The proof was not conclusive that Mr. Hale wrote the letter to Mr. Ramsdell. He is not positive that he wrote it, and he stated that he found no copy of such letter in his letter book, in which it was his custom to keep copies of his letters. Mr. Ramsdell was a witness, and was not asked by either party in regard to this letter. Under the evidence, the question was one of fact for the determination of the jury. It is claimed that the bill of sale upon its face is too indefinite and uncertain to have effect as security. This might become important if Hale had conveyed the title to his company, and if it were conclusively established that the defendant bank had obtained a valid lien upon the property as that of the Watervale Company. As between the vendor and the vendee, or the mortgagor and the mortgagee, the bill of sale could not be held indefinite and uncertain for failure to state the amount secured thereby. Under the instructions, the jury must have found that the title was not conveyed by Hale to the company. Therefore, the defendant is not in position to raise this question. Complaint is made of the rejection of certain testimony offered in regard to statements claimed to have been made by Mr. Hale after the defendant had obtained its mortgage. There was no offer to connect the plaintiff with these statements, and therefore they could not be binding upon it. The testimony was properly rejected. We find no error upon the record, and the judgment is affirmed." First Nat. Bank of Manistee v. Marshall & Ilsley Bank of Milwaukee, 65 N. W. 604.

As before stated, the letter from the Milwaukee Bank to Dunham, cashier of the Manistee Bank, was apparently treated as a letter to the bank itself, and the answer by Dunham as the answer of the bank. Both Dunham and Ramsdell very distinctly state that neither Ramsdell nor any director or other officer of the bank was aware of the letter to Dunham, and that Dunham never mentioned the fact of having received or answered any such letter, and that this fact was only known to Ramsdell a considerable time afterwards. It will be observed by reference to the letter that it makes no inquiry whatever in regard to the Watervale Manufacturing Company or its

property or assets.    The inquiry is of the most general character, and limited to the character and financial standing of Mr. Hale individually.    Ramsdell and Dunham both testify that at the time they were not aware of the fact that the Watervale Manufacturing Company had been formed as a corporation; that they had no knowledge of any proposed loan from the Milwaukee Bank to that company, and no knowledge whatever of any statement made or list of assets prepared and furnished for the purpose of obtaining such loan.    Their denial in these respects is very positive.    We think that, to establish conditions necessary to give rise to an equitable estoppel, it would be necessary to show, not merely that the officers of the Manistee Bank had such general knowledge as the letter from Ilsley to Dunham would imply, but that they had specific knowledge that a loan was being negotiated, and that the real estate on which it held a lien was included in the schedule of property which was being made the basis of the loan, and, further, that the bank officers were aware of the fact that Hale was claiming an unincumbered title to this real estate, as there would exist no reason why Hale might not include the property in the schedule for the purpose of using his equity of redemption therein as a basis of credit, provided the Milwaukee Bank was not misled upon that point.    It certainly could not be maintained that the letter to Dunham, without more, conveyed, by implication, knowledge of any of these specific facts; nor could it be claimed that, in the answer to so general an inquiry, there would be any gross negligence in not disclosing the existence of the Manistee Bank's lien; and the proof in this record fails to establish, in our opinion, any fraudulent intention in making such an answer as was made.    It is quite evident that the supreme court of Michigan, in the case referred to, entertained the opinion that there was nothing in this letter and answer sufficiently specific, as to facts, to give rise to an estoppel, and the view expressed by that court is in harmony with other well-considered cases.

In Brant v. Iron Co., 93 U. S. 326, the elements necessary to constitute an estoppel of the kind now relied on were much considered. Mr. Justice Field, speaking for the court, said:

"It is difficult to see where the doctrine of equitable estoppel comes in here. For the application of that doctrine, there must generally be some intended deception in the conduct or declarations of the party to be estopped, or such gross negligence on his part as to amount to constructive fraud, by which another has been misled to his injury. 'In all this class of cases,' says Story, 'the doctrine proceeds upon the ground of constructive fraud, or of gross negligence, which in effect implies fraud. And, therefore, when the circumstances of the case repel any such inference, although there may be some degree of negligence, yet courts of equity will not grant relief. It has been accordingly laid down by a very learned judge that the cases on this subject go to this result only: that there must be positive fraud or concealment or negligence so gross as to amount to constructive fraud.' 1 Story, Eq. Jur. 391. To the same purport is the language of the adjudged cases. Thus, it is said by the supreme court of Pennsylvania that 'the primary ground of the doctrine is that it would be a fraud in a party to assert what his previous conduct had denied, when on the faith of the denial others have acted. The element of fraud is essential either in the intention of the party estopped, or in the effect of the evidence which he attempts to set up.' Hill v. Epley, 31 Pa. St. 334; Henshaw v. Bissell, 18 Wall. 271; Boggs v. Mining Co., 14 Cal. 368; Davis

v. Davis, 26 Cal. 23; Com. v. Moltz, 10 Pa. St. 531; Copeland v. Copeland, 28 Me. 539; Delaplaine v. Hitchcock, 6 Hill, 14; Hawes v. Marchant, 1 Curt. 136, Fed. Cas. No. 6,240; Zuchtmann v. Roberts, 109 Mass. 53. And it would seem that to the enforcement of an estoppel of this character with respect to the title of property, such as will prevent a party from asserting his legal rights, and the effect of which will be to transfer the enjoyment of the property to another, the intention to deceive and mislead, or negligence so gross as to be culpable, should be clearly established. 'It is also essential,' continued the court, 'for its application with respect to the title of real estate, that the party claiming to have been influenced by the conduct or declarations of another to his injury was himself not only destitute of knowledge of the true state of the title, but also of any convenient and available means of acquiring such knowledge. Where the condition of the title is known to both parties, or both have the same means of ascertaining the truth, there can be no estoppel. Crest v. Jack, 3 Watts, 240; Knouff v. Thompson, 16 Pa. St. 361.' "

The cases of Henshaw v. Bissell, 18 Wall. 255, and Marshall v. Hubbard, 117 U. S. 415, 6 Sup. Ct. 806, are to the same effect.

We have referred to the elements necessary to give rise to estoppel in respect to a right or lien such as that now in question. It has been seen that the facts must be clearly established. We now refer only briefly to such other points in the evidence as have been treated as material, besides the letters just mentioned. Ellis testifies, as before stated, that, in the interview at the Plankinton House, Ramsdell told him that the bank had no lien or incumbrance on the property of Hale, and that he communicated to the vice president of the Milwaukee Bank the conversation thus had with Ramsdell. Ramsdell denies this, as we have seen, and the vice president of the Milwaukee bank, in his testimony, does not sustain Ellis in this respect. It is altogether improbable that Ilsley would have forgotten so important a fact as this, and his failure to sustain Ellis in this respect is very significant. Ellis is the only solvent party on the notes to the Milwaukee Bank, and the payment of the balance due on that debt, or any large part thereof, would render him insolvent. He is therefore testifying under the influence of the strongest possible pecuniary motive. For Ramsdell to have made such a statement at that time was not only to have stated a falsehood directly to the prejudice of his bank, but to have done so under circumstances which did not call for such a statement, and without any adequate motive for doing so. Under these circumstances, we are unable to accept the statement of Ellis as sufficient to overcome the positive denial of Ramsdell. Again, Williams says that he believes Ramsdell saw, in the interview at the Buckner House, the statement of assets, prepared by Hale for the negotiations between him, Mansfield, and Hale, and Ellis says he thinks Ramsdell "gazed over it." It is not suggested, however, that anything was said or intimated to the effect that Hale was claiming to Williams and Mansfield that he had anything more than an equity of redemption in the real estate which it is said was included in that statement; and it is clearly established that both Ramsdell and Hale acted fairly with Williams and Mansfield in disclosing the truth about this property and the existence of the bank's lien thereon. This is clearly shown by the fact that the bank's debt was further secured in the deal which followed, and the further fact that the title is expressly referred to and provided for in the

contract between Hale and Williams and Mansfield, wherein it is stipulated that, when the bank's debt is paid, a warranty deed is to be made for this property to the Watervale Manufacturing Company. So these statements by Ellis and Williams, not very important in themselves, are not sustained by any testimony in the record, and cannot be credited. Williams undertakes to state positively that Hale was to make a warranty deed in the first instance to the Watervale Manufacturing Company, and that he thought this had been done, and was so informed by subsequent letter from Hale. This statement is in direct conflict with the stipulations of the contract signed by Williams and Mansfield, before referred to, and is in conflict with the clearly established fact that Williams and Mansfield fully understood that the bank held title to this real estate to secure this debt. So, Williams states that Ramsdell gave no such memorandum of the date and amounts of payments which might be made on the bank's debt, as Ramsdell says was done, while the exact agreement of this memorandum in respect to the first, second, and third payments, with the corresponding payments provided for in the contract between Hale and Williams and Mansfield, and with the first, second, and third notes executed by Williams and Mansfield to the bank, is obviously important, and, with the other proof, leaves no doubt whatever that Ramsdell is correct and Williams mistaken about the execution and delivery of this memorandum. Without further reference to details, it is sufficient to say that both Ellis and Williams were mistaken about some of the most material facts in the case; so much so that we cannot accept their mere impression or belief in regard to facts of secondary importance, such as this statement last referred to.

The only other material point in the evidence is the statement by Hale, in his letters to Williams and Ellis, that he had written Ramsdell on the 29th of December, 1893, giving him the facts in regard to the negotiations for a loan from the Milwaukee Bank. As we have seen, Ramsdell denies receiving this letter. If such letter had been written, it would not warrant the inference that Hale explained to Ramsdell that he was representing or causing Ellis to represent to the bank that the title to the real estate covered by the Vincent deed was unincumbered and clear. If Hale was practicing a fraud of this kind upon the bank, it is not in accordance with experience that he would inform Ramsdell of such a fact, unless the evidence justified the conclusion that there was a deliberate fraudulent collusion for this purpose previously entered into; and in that case no letter would be necessary, as Ramsdell would understand the scheme without explanation. The learned circuit judge leaves the question whether such letter was in fact written or received undecided; and we need only say that this fact is not made out over the positive testimony of Ramsdell that no such letter was received.

This disposes of all the points in the evidence regarded as material in support of the claim of the Milwaukee Bank; and, having concluded that such evidence is not sufficient to uphold the decree of the court below, it is hardly necessary that we should refer to those phases of the evidence which support the denial of the Milwaukee

Bank and its officers. We may say, however, by way of general observation on the case, that the Milwaukee Bank did not cause such inquiry to be made as reasonable business prudence would have suggested. No examination was made of the records in the proper office for registration of conveyances affecting lands, and where notice could have been obtained in the mode provided by the registration policy of the Michigan law. Had such examination been made, it would have disclosed that the record title to this property was in Vincent, and this would have led to such inquiry as would readily have disclosed all the facts. This is the position of the Milwaukee Bank. There is no evidence to show that the officers of the Manistee Bank were under any great apprehension as to the loss of the bank's debt finally. On the contrary, it must be regarded that the security which they held was reasonably sufficient. In addition, it was clearly understood from the beginning of the negotiations between Hale and Williams and Mansfield, for the sale of a half interest in Hale's property, that the bank was to be paid or further secured by the purchase price coming from Williams and Mansfield, as was subsequently done. So at the time of the negotiations for a loan from the Milwaukee Bank, the Manistee Bank's debt must have been regarded as reasonably safe; and there could exist no strong motive on the part of the officers of the Manistee Bank to enter into a fraudulent collusion, tacit or express, with Hale, to aid the latter in perpetrating a fraud on the Milwaukee Bank; and as Hale and Mansfield resided at Milwaukee, and were fully aware of the true state of the title, a collusive scheme of the kind insisted on could hardly have been looked upon as practicable unless Williams and Mansfield were also made parties to the scheme. It has not been suggested that it was understood on the part of any one that the Manistee Bank was to receive directly any part of the loan from the Milwaukee Bank, while it was to be directly benefited by and to receive the purchase price, or a part of it, in the sale to Williams and Mansfield; and, nevertheless, as we have seen, the true condition of the property was fully made known to Williams and Mansfield. In addition to this, Hale supports Ramsdell and Dunham in the main facts in their testimony. It is true, as was observed by the learned judge, that Hale appears to be making common cause with the Manistee Bank. It is equally true, we think, that Williams, Mansfield, and Ellis are in sympathy with the Milwaukee Bank, and Ellis is liable for the debt of that bank only, while the other three are equally liable to both banks. Ilsley undoubtedly understood that Hale was indebted. Dunham's letter clearly implies this. If details as to the amount of Hale's indebtedness individually, and how secured, if at all, were regarded as material in deciding upon a loan to the corporation, further inquiry was called for. If Dunham had been acting for the bank in answering the letter, he could not reasonably have been expected in replying to so general an inquiry to voluntarily disclose the state of the account with the bank's customer. A bank whose officers would do so as a practice would doubtless soon find itself without customers.

83 F.—47

The letter to Dunham conveyed no information or suggestion as to the details of the reason for the inquiry.

Whatever the letter may have implied to any one was general, and not specific. We need not, however, pursue this line of discussion. The decree proceeds upon grounds which discredit the positive testimony of Ramsdell and Dunham. Admitting the suspicious circumstances, such as withholding the deeds and bills of sale from record, and the absence of the letter copy book, we are not satisfied (the burden of proof resting on appellee) that the result below is sustained by that measure of proof required by law in cases such as this. We conclude, therefore, that there was error in the decree postponing the lien of appellant to that of appellee. Reversed and remanded for further proceedings not inconsistent with this opinion.