HINDMAN v. FIRST NAT. BANK OF LOUISVILLE et al.

(Circuit Court of Appeals, Sixth Circuit. February 4, 1902.)

No. 902.

1. TRIAL—EXCEPTIONS TO CHARGE.

An exception to a charge should be taken before the jury retire, and should be sufficiently definite to call the judge's attention to the particular matter objected to, in order that he may have an opportunity to correct it. It should also embrace but a single proposition, as, if it includes more than one, it is insufficient if either is correct.

2. SAME.

An exception "to the court's measure of damages" as stated in the charge is sufficiently specific where the error, if any, was fundamental, in giving a rule of damages inapplicable to the case, and which affected the entire charge relating to that subject.

3. DAMAGES—ACTION FOR DECEIT—SALE OF STOCK IN CORPORATION.

The measure of the damages recoverable in an action for deceit inducing the purchase of shares of stock in a corporation is the difference between the price paid and the real intrinsic value of such shares at the time of their purchase, and such value is to be ascertained in the light of subsequent events in the history of the company, and not by their market value, although the plaintiff is not entitled to recover for depreciation by reason of subsequent acts which were entirely independent of the causes existing at the time of his purchase.

4. SAME—EVIDENCE—VALUE OF STOCK OF CORPORATION.

On the trial of an action for deceit in making false representations which induced plaintiff to purchase shares of stock in a corporation, all facts relating to the history and condition of the company, both before and after the purchase, are competent on the question of damages, for the purpose of showing the actual value of the stock at the time of the purchase; and it is immaterial whether such facts were or were not known to the defendant.

5. BANKS—LIABILITY FOR TORTS—FALSE STATEMENT BY CASHIER.

A statement made by the cashier of a bank, certifying to the insurance commissioner of a state that a recently organized insurance company had on deposit in the bank a sum which had been paid in as the full amount of the capital stock of the company and as a surplus fund, is false where a considerable portion of the deposit consisted of the proceeds of notes given by subscribers in payment for stock, and by officers of the company, which the bank had discounted on the indorsement of the company, and for which it held the stock as collateral security, whether such discounts were real or pretended, since the bank had knowledge that the deposit did not represent either capital or surplus; and, where such certificate was made in the interests of the bank, for the purpose of enabling it to secure a large deposit from the company, or to sell the stock it held as collateral, it was an act done in the due course of business, for which the bank is responsible.

6. SAME.

The cashier of a bank is the proper officer to receive deposits and to give certificates or vouchers in respect thereto, which may properly include, with the consent of the depositor, a statement of the source from which the deposit arose; and for a false statement in that respect, made to subserve the interests of the bank, the latter is liable in tort to one injured thereby, although the cashier was not expressly authorized to make such statement by the board of directors.

7. FRAUD—ACTION FOR DECEIT—PERSONS ENTITLED TO SUE.

That a state insurance commissioner was induced to issue a license to do business to an insurance company by a certificate made by a bank, falsely stating that the company had the full amount of its capital stock, as well as a surplus, on deposit therein, does not give

a right of action against the bank for fraud and deceit to one who purchased stock of the company solely in reliance on the fact that it had been licensed to do business, or even in reliance on such certificate as a part of the public records; but the plaintiff in such case must show some direct connection between the bank and the communication of the statement, either to himself personally or the general public. It is sufficient to establish such connection, however, and to give a right of recovery, that the bank, knowing that plaintiff contemplated the purchase of stock, referred him to such certificate for information, and that he acted on the information obtained therefrom.

8. SAME—FRAUDULENT REPRESENTATIONS.

To sustain an action for fraud and deceit, based on false representations by defendant by which plaintiff was induced to purchase property, it must be shown (1) that the representation was false and (2) that the person making it knew it to be false; but if the fact was one within his means of knowledge, and he had no knowledge of it, a jury is authorized to find that the statement was knowingly false.

9. SAME.

In such an action, it is not essential to show that defendant derived any benefit from the deceit, nor that it was the sole inducement moving plaintiff, although it must have materially affected his action.

In Error to the Circuit Court of the United States for the District of Kentucky.

This was an action by Thomas C. Hindman to recover damages for the fraudulent and false representations of the defendants, whereby he was induced to buy shares of the capital stock of the Columbian Fire Insurance Company of America, which shares have proven worthless. A demurrer to the petition was sustained, and the plaintiff's petition dismissed. At a former term of this court we held that the court below had erred in sustaining the demurrer, and the cause was remanded, with directions to overrule same. 39 C. C. A. 1, 98 Fed. 562, 48 L. R. A. 210. Thereupon the defendants answered, and issue was joined. There was a verdict and judgment for defendants.

The outlines of the case necessary to be stated are these: The insurance company in which Mr. Hindman became a shareholder was a Kentucky corporation. Under the law of that state, it could not begin business until all of its capital had been actually paid in in cash, nor until the state insurance commissioner should be satisfied that this was a fact, and should issue his license accordingly. On December 31, 1892, he authorized the company to begin business, and issued a certificate or license, which, among other things, certified that the company "had a paid-up capital of $200,000, and a net surplus of $48,182.90, which is in cash, and deposited in the First National Bank of Louisville, Kentucky, as shown by the certificate of the cashier of said bank and the sworn statement of the president and secretary of said company." The cashier's certificate referred to is in these words: "Thos. R. Sinton, being duly sworn, deposes and says that he is cashier of the First National Bank of Louisville, Ky., and that said bank, on this December 31, 1892, has on deposit to the credit of the Columbian Fire Insurance Company of America, of Louisville, Ky., two hundred and forty-eight thousand one hundred and eighty-two and $90/100$ ($248,182.90) dollars, of which amount two hundred thousand ($200,000) dollars has been paid in as the full amount of the capital stock of said Columbian Fire Insurance Company of America, and forty-eight thousand one hundred and eighty-two and $90/100$ ($48,182.90) dollars has been paid in as the net surplus of said company." There was evidence tending to show that there was a shortage in paid-up capital shares of not less than $100,000 when these certificates were issued and the company launched in business. It was shown that the company did have a deposit in the First National Bank on that date of $248,182.90, which was subject to its check. But there was also evidence tending to show that about $60,000 of this sum was proceeds of notes discounted by the insurance company, purporting to be notes made by sub-

scribers for shares, and secured by stock attached as collateral, and that the insurance company was bound on these notes either as indorser or guarantor. There was also evidence tending to show that $25,000 of this credit was made up by the deposit of a certificate of deposit issued by the Tradesman's National Bank of New York, and that this deposit was procured by the discount in New York of the note of the New York agents of the company upon an agreement by which the premiums received by the New York agents were to be deposited with the Tradesman's Bank, and appropriated to the payment of the discounted note; the note being also secured by shares of the company as a collateral. It was not shown that the bank knew the history of this certificate of deposit, though it is shown that it was requested to hold the certificate for 30 days, and that in fact it was so held until March 23d before being sent on for collection. Five of the notes discounted by the defendant bank were notes purporting to be made by subscribers for stock, and these notes were secured by the shares and the indorsement of the company. The sixth note discounted by the defendant bank was made by Mr. A. W. Hart, the principal organizer of the company, and its general manager. Hart's note was for $46,875. It was discounted December 28, 1892. Shares aggregating 375 were attached to it as collateral, and it was indorsed or guarantied by the company. Hart was not financially good for this sum, or anything like it. There was evidence tending to show that the officials of the bank knew that this note was made to take the place of subscribers who had failed to take their stock, and that it was represented to the bank that there were persons who had promised to take these shares who were good, and that as they came forward and took the stock the proceeds of such allotments would be paid on the note, and stock withdrawn in proportion to payments. Mr. Hart himself testified that he told the officials of the bank that it was desired to begin business January 1, 1893, and urged as a reason for discounting this and other notes standing for stock that "we would have a large account in the bank, and would continue always to have a large balance for the necessities of the business, and that the stock would be taken up, and the notes would be paid." It may therefore be stated that there was evidence tending to show that the bank knew that at least to the extent of $60,000 the capital stock of the bank had not been paid in when the certificate of December 31, 1892, was made, and that to this extent, at least, the statement in the certificate was misleading and deceptive, inasmuch as to that extent the deposit did not represent capital stock or surplus paid in, but arose from discounted paper upon which the company was liable. In January, 1893, Mr. Hindman began negotiations with the insurance company looking to securing the general agency for California, his dealings being chiefly with A. W. Hart, the company's general manager, and Mr. C. B. Sullivan, one of the defendants, who was actively engaged as a member of its executive committee. He testified that these gentlemen pressed upon him the necessity of becoming a shareholder, as it was the policy of the company to have its important agents interested in that way; and that in answer to his inquiries they represented that the entire capital had been paid in at a premium of 25 per cent.; that some subscribers had not taken their stock, but that such stock had been taken by other of the promoters, who had therefore acquired more stock than they wished; and that he could have 80 shares of stock, so taken. He says that he was referred to the defendant bank as the company's depository for information as to the capital of the company. He further testified that he did call at the bank, and was informed by its president that the stock was good, and that the bank had made a statement to the insurance commissioner showing that its entire capital had been paid in, and was on deposit, and that such a statement would not have been made unless true. He further testifies that he subsequently visited the state insurance commissioner, and asked to see the certificate of the bank, and was shown same; and that, in reliance upon the truth of that certificate, and of like statements made by defendant Sullivan and others, he agreed to take and did take and pay for 80 shares in the capital of the company, paying therefor, on February 6, 1893, the sum of $10,000. The stock delivered to him was part of the stock attached as collateral to the note of A. W. Hart,

above referred to, which shares purported to have been originally issued to the defendant C. B. Sullivan. In about one year the company failed. Its assets were insufficient to pay its debts. The shareholders will receive nothing. Mr. Hindman did not discover the facts stated in respect to the shortage in capital until after the failure of the company, and still holds his shares.

W. W. Thum, for plaintiff in error.

Alex. P. Humphrey, for defendants in error.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

LURTON, Circuit Judge, having made the foregoing statement of the case, delivered the opinion of the court.

The plaintiff in error has presented no less than 182 assignments of error, an unnecessarily prodigious number. No less than 41 of these are errors assigned upon the charge of the court. These are all based upon 8 exceptions taken to the charge. Objection is made that these exceptions are too general; that each is an exception covering several distinct propositions; and that, if any proposition be good, the whole exception must fail. Johnson v. Garber, 19 C. C. A. 556, 73 Fed. 523. An exception to a charge should be taken before the jury retire. It should be sufficiently definite to call the judge's attention to the particular matter objected to, in order that he may have an opportunity to correct it. Neither should an exception cover two distinct propositions, for such an exception is insufficient if either one should prove correct. Railroad Co. v. Jurey, 111 U. S. 596, 4 Sup. Ct. 566, 28 L. Ed. 527; Bogk v. Gassert, 149 U. S. 25, 13 Sup. Ct. 738, 37 L. Ed. 631; Holloway v. Dunham, 170 U. S. 619, 18 Sup. Ct. 784, 42 L. Ed. 1165; Felton v. Newport, 34 C. C. A. 470, 92 Fed. 470. This objection must be regarded as fatal to most of the exceptions taken to the charge as delivered, though there is one objection which may fairly be regarded as sufficiently definite to base assignments of error upon. That exception is in these words: "We desire to also except to the court's measure of damages in this case." What the court had said on this subject was this:

"If the jury should conclude that the plaintiff is entitled to recover anything, then the measure of the plaintiff's damages would be the difference between the value of the eighty shares of stock on the 31st day of December, 1892, and its value of February 6, 1893, when the plaintiff bought it. Interest may be allowed on this, if the jury see fit. For any depreciation which may have resulted after the latter date the defendants would not be responsible, inasmuch as that depreciation may have been the result of causes with which the defendants had no connection."

This paragraph was followed by some observations upon parts of the evidence, intended as an application of the proposition of law quoted, which did not involve the statement of any new or distinct proposition. This exception has been criticised, but we think the trial judge could not have misapprehended the scope of the exception, and that the charge on this subject of damages may be regarded as constituting a single subject. In dealing with an objection to an exception this court, in Felton v. Newport, 34 C. C. A. 470, 92 Fed. 470, speaking by Circuit Judge Severens, said:

"The charge upon this subject was entire, and bound up in a single proposition. If it was erroneous in any substantial particular, it would seem that the exception would reach the error, especially when it pervades the whole instruction given upon the subject."

The instruction limited the plaintiff to a recovery of the difference between the value of the shares on December 31, 1892, the day the company was licensed to do business, and February 6, 1893, the date when plaintiff bought his share; in other words, if the shares of the company were worth as much on February 6, 1893, as they had been on December 31, 1892, the plaintiff had sustained no loss, although at both dates the shares may have been of much less intrinsic value than the price paid for them. This instruction was erroneous, and must result in a reversal and a new trial.

In its essence Mr. Hindman's action was a common-law action for deceit. His complaint, in substance, is that he has been led into the purchase of shares in the Columbian Insurance Company, which has proven a most ruinous investment, and that he was induced to buy through reliance upon the certificate made by the defendant bank, upon which that corporation was licensed to do business, and upon like representations made to him when negotiating by the defendant Sullivan, who was at least his nominal vendor. There was evidence tending to show that the defendant Sullivan was one of the promoters and corporators of the company, and an active member of its directory; and that Sullivan, to induce Hindman to become interested in the company, made representations in respect to the capital stock of the company in substance identical with those found in the certificate made by the cashier of the defendant bank; and that Sullivan, together with Hart, the company's general manager, referred plaintiff to the bank for a verification of their statements in respect to the company's paid-in capital. In the former opinion of this court we had occasion to point out some of the principles upon which the bank might make itself liable to Mr. Hindman's action, and we will not at this point stop to consider how far the evidence produced tended to make a case against either the bank or Mr. Sullivan. If the bank and Sullivan knowingly made misleading and false statements in respect to the financial condition of the insurance company, upon which Mr. Hindman, under the circumstances, was entitled to rely, and if he was induced thereby to purchase shares, what is the measure of the liability of the defendants? The plaintiff, in reliance upon the representations made by the defendants, has done an act by which he says he has sustained the loss of his entire investment. But does it follow that, because there has been an ultimate loss of his entire investment, that he is entitled to recover that entire loss? He has paid out $10,000. He has received 80 shares of the company's stock. The defendants are responsible only for the difference between the value of that which he received and the price he paid. Compensation is all that he is entitled to. If the stock was worthless when he bought it, the price he paid, with interest, is the measure of his recovery. If, on the other hand, the shares had some intrinsic value, that value should be deducted from the price. That the shares had then and afterwards a market value is of no importance. The plaintiff was under no obli-

gation to sell, and might hold for an investment, if he saw fit. Smith v. Bolles, 132 U. S. 125, 10 Sup. Ct. 39, 33 L. Ed. 279; Peek v. Derry, 37 Ch. Div. 541; Smith v. Duffy, 57 N. J. Law, 679, 32 Atl. 371. The rule seems to be that the damages recoverable in an action for deceit, where the plaintiff has been induced to purchase shares in reliance upon untrue representations, is the difference between the price paid and the real intrinsic value of such shares at the time of their purchase; and that such value is to be ascertained in the light of subsequent events in the history of the company, and not by the market price. Where the subject of the purchase is tangible property, the real actual value and the market value are for the most part one and the same. But market sales of corporation shares may not be any real indication of real intrinsic value. In Peek v. Derry, Cotton, L. J., in commenting upon the injustice of measuring intrinsic value by market price of shares, said:

"I do not know whether there was any market in this case, but the market might have been effected by the representations which were made by the defendants which induced the plaintiffs to act, and which might have induced others to act."

The ascertainment of the real and intrinsic value of shares in a corporation at a given date presents difficulties which do not occur with respect to more tangible kinds of property. Justice would seem to forbid that in such circumstances the plaintiff should be allowed to gain a benefit by subsequent independent acts tending to depreciate such shares, wholly disconnected with the vice in the company which existed when he acquired his shares. These difficulties were appreciated in Peek v. Derry, cited heretofore; for Lord Cotton, in speaking of subsequent events, said:

"Nor do I think he ought to be precluded from taking into account the subsequent events. Although the value of the shares is not to be ascertained at the subsequent period, so as to take into account for the benefit of the plaintiff events subsequent which depreciated their value, yet those events, if they show that the company was originally, with the capital which it had got, a company which was worthless, may, in my opinion, be taken into account as evidence of what was the value of the shares immediately after they were allotted to the plaintiff. So that it may be that, useful as this discussion has been in order to elucidate what ought to be the proper time for ascertaining the value, it may ultimately produce no good result to the defendants. But I think it is in accordance with the cases, and in accordance with the principle, that the real value, and not the market value, is to be ascertained immediately after the day when the shares were allotted to the plaintiff."

In the same case, Sir James Hannen, in dealing with this matter of damages in actions for deceit in sales of shares, said:

"The question is, how much worse off is the plaintiff than if he had not bought the shares? If he had not bought the shares, he would have had his $4,000 in his pocket. To ascertain his loss, we must deduct from that amount the real value of the thing he got. That must be ascertained by the light of the events which have happened down to the time of the inquiry, not what the shares might have been sold for, because he was not bound to sell them; and subsequent events may show that what the shares might have been sold for was not their true value, but a mistaken estimate of their value."

That the price should be reduced by the actual value of the property acquired seems to have the sanction of the supreme court, for in Smith v. Bolles, 132 U. S. 125, 130, 10 Sup. Ct. 39, 40, 33 L. Ed. 279, 282, the court said:

"What the plaintiff paid for the stock was properly put in evidence, not as the basis of the application of the rules in relation to the difference between the contract price and the market or actual value, but as establishing the loss he had sustained in that particular. If the stock had a value in fact, that would necessarily be applied in reduction of the damages."

The falsity of the certificate issued by the cashier of the defendant bank, upon the strength of which the plaintiff claims the insurance commissioner licensed the company, and upon which he claims to have acted in buying this stock, consists in its plain implication that the capital and surplus of the company had been fully paid in, and that this capital and surplus was on deposit free from all claims and liabilities. The evidence tended to show that probably $100,000 of the capital stock had never been paid in cash, and that the bank officials were quite aware that this was so to at least the extent of $60,000, inasmuch as they knew that the deposit account of the company included proceeds of discounted subscribers' notes to that extent, upon which the company was then bound as indorser or otherwise. That the bank had on deposit $248,182.90 was, doubtless, true, and that this was subject to the check of the company appears to have been also true. That the discounts were absolute, and not "pretended" or "fictitious," may, in a sense, have been also true. But the ground of action in this case consists in the fact that the capital stock of the company had not been up in cash, as required by law, and that it was not true that $200,000 of the amount on deposit had "been paid in as the full amount of the capital stock of said Columbian Fire Insurance Company of America, and $48,182.90 has been paid in as the net surplus of said company." If any substantial part of the sum so on deposit arose from the discount of the notes of real or pretended subscribers upon which the insurance company remained liable as indorser or otherwise, then it was not true that $248,182.90 had been paid in as capital and surplus. Whether the discounts made by the bank of such paper were bona fide or "pretended," the result would be the same. The plain purpose of the Kentucky corporation law was to make it a condition upon which such companies might engage in business that their authorized capital stock should be actually and fully paid in before a license should issue to do business. Shares sold on a credit were not shares paid in, and the discount of notes made by such credit purchasers upon an indorsement or guaranty of the company itself would be a fraudulent evasion of the law, and proceeds arising from such discounts would not be capital stock paid in, but borrowed money masquerading as capital. If, therefore, the jury should believe that the bank knew that a large proportion of the sum on deposit arose from proceeds of such notes, it would know that the deposit did not consist of either capital or surplus, and the certificate would be false and misleading, without regard to whether the discounts were "false," "pretended," "fictitious," or genuine and real. That Mr. Hindman was partly

induced to purchase this stock in order to secure an agency is
no defense, if his action was in fact influenced by his confidence
in the truth of the financial condition of the company as shown
by this bank statement. It was competent upon the question of
the intrinsic value of the shares to show what the true condition
of the company was at that date. It was competent to show any
and every fact touching the various contracts under which this de-
posit of $248,182.90 had been secured. For this purpose it was com-
petent to show the history of the New York certificate of deposit, and
the agreement under which that certificate had been obtained, and
how it was finally paid. It was also competent to show the inside
history of the organization, including the history of each of the dis-
counted notes, and the mode in which they were subsequently taken
up or paid off. The true inquiry will be, what was the real, intrinsic
value of the share bought by plaintiff? for his damages must be re-
duced by deducting that value. Whatever tended to show the want
of intrinsic value of shares in a company in the circumstances of this
company at the time of the purchase was competent evidence.

The other exceptions to the charge, so far as they bear upon the
merits of the case, are insufficient in form to be the basis of an as-
signment of error. There are, however, a very large number of as-
signments of error based upon rulings made by the court below dur-
ing the course of the trial, and a number of other assignments based
upon the refusal of the court to give special instructions duly re-
quested. It would be an unnecessary and unprofitable labor to deal
with these assignments seriatim. Some of them are good, and some
are bad. Neither must we be understood as indorsing the charge of
the learned court. It seems to lay altogether too much stress upon
the charge of conspiracy, and the averments that the deposit was
not bona fide subject to the check of the insurance company. The
petition of the plaintiff is unnecessarily rich in vigorous averments,
many of which are not essential to the maintenance of an action for
fraud and deceit. The gravamen of the plaintiff's case, against both
the bank and Sullivan, lay in the alleged falsity of the representation
that $248,182.90 had been paid in on account of capital stock and sur-
plus. Whether the bank had conspired with the insurance company,
or with Sullivan, or with certain other promoters and managers of
the insurance company, for the purpose of foisting on the public an
unripe corporation, whose capital stock had not been paid in as
required by law, constituted one phase of the plaintiff's case. But
the plaintiff's case did not altogether depend upon proof of a con-
spiracy, or upon evidence that the public at large were invited to
become purchasers of shares in reliance upon the representations
made by either Sullivan or the bank, or both. Facts enough were
stated in the plaintiff's voluminous and redundant petition to justify
a recovery, if the jury should believe that the bank, for its own busi-
ness purposes, knowingly misrepresented the financial condition of
the insurance company, in respect to the nature of its account as a
depositor, with the intent that the plaintiff should be induced to
buy shares. This aspect of the case was not properly put to the jury,
and, inasmuch as the case must go back for a new trial, we shall

briefly indicate the general principles upon which such new trial should proceed, without applying our views to particular specifications of error.

1. The implied authority of the cashier to bind the bank by misrepresentations in the statement or certificate, which is the foundation of the plaintiff's action against the bank, was more than doubted by the court below, and to this question we shall first address ourselves. That the giving of such a certificate at the instance of a customer would not be ultra vires the corporate power of the bank, even if it should include a statement of the purpose for which the deposit had been paid in, was decided in our opinion upon the former writ of error. That question need not be reconsidered or the argument repeated. 39 C. C. A. 1, 98 Fed. 562, 48 L. R. A. 210. We did not there consider the authority of the cashier to bind the bank by false statements in such a certificate, if given by him without the direction of the directors, because the questions then decided arose upon a demurrer to a petition which averred that the cashier acted by order of the board of directors. But how can it be said that, without the authority of the board of directors, the cashier's action in giving such a certificate would not be the act of the bank? This is not an action to enforce a contract made by the cashier. Different rules prevail when a suit is upon contract than those applicable in an action for a tort. If the cashier's act is the act of the bank, the liability of the latter for the tort may be plain, although it might not be liable for a promise by the cashier made under the same circumstances. Morse, Banks, § 171; Thomp. Corp. §§ 4779, 6283. The cashier is the proper officer to receive deposits and to give certificates or vouchers in respect thereto. Morse, Banks, § 161. If he knew, or assumed to know, the source from which the deposit arose, we see no reason why he might not include such a fact in his certificate, if the customer consented or the business of the bank would be thereby subserved. We quite agree with Judge Barr, who heard this case below on a demurrer, who, on this subject, said:

"As the First National Bank had the right to accept the deposits of the insurance company, it would seem to follow, as an incident to receiving deposits, that the cashier might state, orally or in writing, to those authorized to inquire, the amount of the deposits and the nature of the deposits, whether on account of capital stock or surplus, or whether a general deposit. That far he was acting under the corporate powers and in the usual course of his business. He had also the corporate power, in the course of his business, to state more than what the books of the bank showed, if he personally knew the fact, or assumed to know the fact, in the performance of his official duties, as to the amount of the deposit or the character of the deposit. In the absence of any evidence, and assuming that the allegations of the bill are true, it may be presumed that thus far the facts stated by the cashier of the First National Bank in regard to the character of the deposit, whether it was capital stock or capital stock and surplus, was such as the books of the bank showed, or such as the cashier of the bank and the custodian of the deposits had a right to know and might communicate. So that, if he knew the deposit was made up by discounts credited, with the intention of swelling the deposit, with a view to deceiving the insurance commission into believing that the capital stock was paid up, it would be within the bank's corporate powers. The liability in such a case would be because the false representations were made about a thing which

was, the bank's business in connection with its corporate powers, and in the usual course of the business of the cashier of the bank." 86 Fed. 1012, 1016.

The division into capital stock and surplus was equally within his competency to state to one entitled to inquire, though of no particular significance to the state insurance commissioner, whose duty was limited to inquiring and certifying that the company's capital "had been paid in and is possessed by it in money." Act 1870 (Gen. St. 1888, p. 66, § 7). The material thing to the commissioner was that this certificate, if true, established the conditions which entitled the company to begin business. The mere fact the company had to its credit an amount of money equal to its authorized capital would be an immaterial fact, unless it should also appear that that deposit constituted capital stock paid in and "possessed by it in money." This was, therefore, the material thing to which the cashier certified, and if this fact appeared from the books or deposit slips of the bank, or was otherwise known or supposed to be known to the cashier, he, as the custodian of the deposit and chief executive of the bank, was acting within the apparent scope of his duty and authority, when he gave this statement. That it was sworn to does not affect its character as an act of the bank. It was the certificate of the bank's cashier, and so officially signed. It was sworn to by the gentleman who filled that office. The jurat was necessary for the purpose of the state insurance commissioner, and added weight to the representation, to whomsoever it may have been addressed. If the act itself was not so far beyond the general scope of the powers of a banking corporation as to carry notice to all of its ultra vires character, and the certificate was given, not for the personal purposes of the cashier, but in the general course of the bank's business, the bank would be liable in an action of tort as fully as if made by direction of the board of directors.

It is no answer to say that the bank did not authorize a false statement. That may be true. But, as observed by Mr. Justice Willes, in Barwick v. Bank, L. R. 2 Exch. 259, it has "put the agent in his place to do that class of acts, and it must be answerable for the manner in which the agent has conducted himself in doing the business which it was the act of the master to place him in." In Gaslight Co. v. Lansden, 172 U. S. 534, 544, 19 Sup. Ct. 296, 300, 43 L. Ed. 543, the supreme court said:

"The result of the authorities is, as we think, that, in order to hold a corporation liable for the torts of any of its agents, the act in question must be performed in the course and within the scope of the agent's employment in the business of the principal. The corporation can be held responsible for acts which are not strictly within the corporate powers, but which were assumed to be performed for the corporation and by the corporate agents who were competent to employ the corporate powers actually exercised. There need be no written authority under seal, nor vote of the corporation constituting the agency or authorizing the act. But in the absence of evidence of this nature there must be evidence of some facts from which the authority of the agent to act upon or in relation to the subject-matter involved may be fairly and legitimately inferred by the court or jury. Salt Lake City v. Hollister, 118 U. S. 256, 260, 6 Sup. Ct. 1055, 30 L. Ed. 176; Railroad Co. v. Harris, 122 U. S. 597, 609, 7 Sup. Ct. 1286, 30 L. Ed. 1146; Railroad Co. v. Prentice, 147 U. S. 101, 109, 13 Sup. Ct. 261, 263, 37 L. Ed. 97, and cases cited at page 110, 147 U. S., and page 264, 13 Sup. Ct., 37 L. Ed. 97."

The case of Bank v. Scofield, 39 Vt. 590, and Ellerbe v. Bank, 109 Mo. 445, 472, 19 S. W. 241, are instances of corporate liability for misrepresentations made by an officer of the corporation. Mapes v. Bank, 80 Pa. 163, is not a case which meets our approval. In First Nat. Bank v. Marshall & Illsley Bank, 28 C. C. A. 42, 83 Fed. 725, we held that when a cashier, as a mere act of courtesy, answered an inquiry as to the financial standing of a customer, the bank would not be liable if the answer should prove false. But the reason of the decision, as stated in the opinion of Judge Clark, was that the cashier was not at the time acting in respect to some interest or business of the bank; his response being a mere voluntary statement, "having no relation to any business transaction with the bank."

2. To what extent did the plaintiff have a right to rely upon the truth of the representations contained in the cashier's certificate? Some direct connection between the bank and the plaintiff in error in the communication of this certificate is essential to a recovery. If the statement was addressed to, and intended only to influence the action of, the state insurance commissioner in respect to the licensing of the insurance company, he cannot sustain a recovery, even though he and others may have been led into the purchase of the shares of the insurance company as a consequence of the action of the insurance commissioner in admitting the company to do business upon the representation of the bank's certificate. The plaintiff's action, in the aspect of it now under consideration, is for fraud and deceit, and such an action must be bottomed upon false representations made to him, and with intent that he should be influenced thereby. The plaintiff does not sufficiently connect himself with the misrepresentations by the bare fact that he bought stock in a company which was improperly admitted to do business upon representations addressed to the state commissioner. The injury in such case is too remote. In Bedford v. Bagshaw, 4 Hurl. & N. 538, an action was sustained against certain promoters and managers of a company who had made false statements in respect to the capital of the company in order to secure its insertion in the official lists of the stock exchange. The plaintiff, knowing that the rules of the stock exchange admitted no stocks to its lists until two-thirds of the shares had been paid up, bought on the exchange in reliance that the shares so bought had been paid up accordingly. This proving not to be the case, the plaintiff was suffered to recover, although the false representation had been made to the committee of the stock exchange, and not to the plaintiff directly. The decision was subsequently overruled in Peek v. Gurney, L. R. 6 H. L. 377, 397. Lord Chelmsford, in commenting on the decision, said:

"The actions were brought upon the allegation of a false representation made to the plaintiff. But no representation at all was made which reached either his eyes or his ears. From his knowing the rules of the stock exchange, he assumed that a certain representation had been made, and acted upon it."

In Peek v. Gurney a descriptive prospectus was put forth by the directors of a company, in reliance upon which the plaintiff bought shares on open market. It was held that the prospectus in its terms

was not an invitation to the public ultimately to become holders of shares, but to join the company at once by becoming original allottees of shares, and that only those drawn in by the misrepresentations of the prospectus to become allottees could have a remedy in action for the deceit. In line with Peek v. Gurney is the case of Hunnewell v. Duxbury, 154 Mass. 286, 28 N. E. 267, 13 L. R. A. 733. The law of Massachusetts required the officers of a foreign corporation desiring to do business in the state to file with the commissioner of corporations a certificate showing its financial condition. The plaintiff gave credit upon the faith of the statements in such a certificate, which had been called to his attention by his own attorney. The Massachusetts court held that the action would not lie, saying:

"To sustain such an action, misrepresentations must either have been made to the plaintiff individually, or as one of the public, or as one of a class to whom they are in fact addressed, or have been intended to influence his conduct in the particular of which he complains. This certificate was not communicated by the defendants or by the corporation to the public or to the plaintiff. It was filed with a state official for the definite purpose of complying with a requirement imposed as a condition precedent to the right of the corporation to act in Massachusetts. Its design was, not to procure credit among merchants, but to secure the right to transact business in the state. The terms of the statute carry no implication of such a liability."

That this certificate constituted a part of the files in the office of the state insurance commissioner, and that it was his duty, on demand, to furnish copies to any of the public, or that he might himself, as a state official, include such certificate in his own official publications, is not enough to show that the bank had any other design in giving it than to influence the action of the commissioner. The circumstance that it might thus come to the eye of persons disposed to deal in the company's shares, and thus induce them to buy, is only evidence to be looked at with other circumstances tending to show that the bank designed to influence the public at large or the plaintiff in particular to buy the company's shares. The Kentucky statute carries no implication of civil liability for a false statement, although it does make the giving of a false statement to the commissioner a criminal offense. The right of one of the public who has sustained a loss by the wrongful setting on foot of an insurance company whose capital has not been paid in, and of one who has bought shares or given credit to such a company in reliance upon the truth of representations made to the commissioner only for the purpose of inducing his action, must depend upon the general principles of law in respect of actions for false representations. It has never been a ground of action that the defendant made a dishonest representation, and that the plaintiff had relied upon it and sustained injury. The moral obligation to speak the truth is not ground for a civil action, unless the misrepresentation was intended to induce the very action by the plaintiff which has resulted in his damage. Cooley, Torts, p. 493; Wells v. Cook, 16 Ohio St. 67, 88 Am. Dec. 436; Barry v. Crosky, 2 Johns. & H. 1. However lamentable the eventual results of a dishonest representation to persons who in reliance thereon have come to grief, they cannot recoup such losses

unless they are able in one way or another to bring themselves within the class of persons for whom the representation was intended.

But it was never meant to decide in Peek v. Gurney that a company's prospectus might not be broad enough to stand not only as an invitation to original allottees, but to all others who might be disposed to deal in the company's shares. And so the case was explained in Andrews v. Mockford [1896] 1 Q. B. 372, where it was held that if the object of a prospectus is not only to induce applications for original allotments of shares, but also to induce persons to whom it was sent to purchase shares in the market, its function would not be exhausted when all the shares should be subscribed, and that the persons issuing the prospectus would be responsible for the injury sustained in reliance upon the truth of statements therein, known to be false, by any person to whom the paper was sent who should, in consequence, buy on the market. Scott v. Dixon, 29 Law J. Exch. 62, note, was approved in Peek v. Gurney. The case seems only to be reported in a note to Bedford v. Bagshaw, 4 Hurl. & N. 538. As stated in the opinion of Lord Chelmsford, the action was for a misrepresentation made in a report by the directors to the shareholders of a banking company. Plaintiff was not a shareholder, and, in the absence of other circumstance, could not be regarded as addressed. But it was shown that copies of the report were left at the bank, and were to be had by brokers and all persons applying for them who desired information with a view to the purchase of shares, and that the plaintiffs, through their broker, purchased at the bank a copy of the report, and in reliance bought shares and sustained a loss; a material statement being false. There was a judgment for the plaintiffs. Lord Chelmsford said:

"I do not doubt the propriety of this decision. The report, though originally made to the shareholders, was intended for the information of all persons who were disposed to deal in shares; and the representation must be regarded as having been made, not indirectly, but directly to each person who obtained the report from the bank, when it was publicly announced it was to be bought, in the same manner as if it had been personally delivered to him by the director."

The true inquiry is, who did the bank design to influence by its false representation? If the representation here involved was not only made to induce favorable action by the state insurance commissioner, but was also intended for the information of all who should be disposed to deal in the company's shares, and who should inspect it for information in respect of the company's capital, it should be regarded as addressed to every such person. So, if the jury should find that the plaintiff was known to the bank as a person disposed to buy such shares, and was referred to this statement for information concerning its capital, they would be justified in finding that the representation was addressed to him personally. Such reference of the plaintiff to the certificate would be a repetition of the misrepresentation addressed directly to him, and render it liable, irrespective of the original design and purpose with which the certificate was given.

· 3. Was the misrepresentation knowingly false? One who has been induced by false representations to buy property has open to him no less than three remedies. He may rescind and sue at law for the consideration, he may bring an equitable suit for rescission and obtain full relief, or he may retain what he has received and bring his action for fraud and deceit. The first two kinds of relief lie, as is most evident, only against the vendor. The third will lie against either the vendor or any third person through whose false representations, directly made, the plaintiff has sustained damages. Cook, Corp. § 354, and cases cited. Before the plaintiff can recover in an action of deceit, he must prove two things: that the representation was false, and that the person making it knew it was false. Glasier v. Rolls, 42 Ch. Div. 436; Derry v. Peek, 14 App. Cas. 337; Kountze v. Kennedy, 147 N. Y. 124, 41 N. E. 414, 29 L. R. A. 360, 49 Am. St. Rep. 651; Cook, Corp. § 355; Trimble v. Reid, 97 Ky. 713, 31 S. W. 861. Such an action differs essentially from one brought for rescission of a contract on the ground of misrepresentation. In the latter kind of suit it is immaterial whether the representation was made dishonestly or not. If the contract was obtained by misrepresentation, however honestly made, it cannot stand. But, when the action is for fraud and deceit, it is not enough to show that the representation was untrue; for, if it was honestly believed to be true, that is a good defense. Derry v. Peek, cited above. But a representation recklessly made, without knowledge of its truth, could not be a statement honestly believed. Cooper v. Schlesinger, 111 U. S. 148, 4 Sup. Ct. 360, 28 L. Ed. 382. "Fraud must concur with the false statement in order to give a ground of action." Evans v. Collins, 5 Q. B. 804, 820; Pasley v. Freeman, 2 Smith, Lead. Cas. 74. Lord Herschell, in Derry v. Peek, thus summed up the authorities:

"First, in order to sustain an action of deceit, there must be proof of fraud, and nothing short of that will suffice. Secondly, fraud is proved when it is shown that a false representation has been made (1) knowingly, or (2) without belief in its truth, or (3) recklessly, careless whether it be true or false. Although I have treated the second and third as distinct cases, I think the third is but an instance of the second; for one who makes a statement under such circumstances can have no real belief in the truth of what he states. To prevent a false statement being fraudulent, there must, I think, always be an honest belief in its truth. And this probably covers the whole ground; for one who knowingly alleges that which is false has obviously no such honest belief. Thirdly, if fraud be proved, the motive of the person guilty of it is immaterial. It matters not that there was no intention to cheat or injure the person to whom the statement was made."

· A representation in respect to a matter, with the intent to influence the conduct of another, implies necessarily the belief of the party making it that the statement is true. If the fact be one within his means of knowledge, and he have no knowledge of the fact, a jury would be authorized to believe that the statement was knowingly false. Kountze v. Kennedy, 147 N. Y. 124, 41 N. E. 414, 29 L. R. A. 360, 49 Am. St. Rep. 651; Prewett v. Trimble, 92 Ky. 176, 17 S. W. 356, 36 Am. St. Rep. 586; Cole v. Cassidy, 138 Mass. 437, 52 Am. Rep. 284.

In respect to evidence tending to establish that the false representation was made knowingly, Lord Herschell, in Derry v. Peek, 14 App. Cas. 337, 375, expressed a view which meets with our hearty approval when he said:

"At the same time I desire to say distinctly that, when a false statement has been made, the questions whether there were reasonable grounds for believing it, and what were the means of knowledge in the possession of the person making it, are most weighty matters for consideration. The ground upon which an alleged belief was founded is a most important test of its reality. I can conceive many cases where the fact that an alleged belief was destitute of all reasonable foundation would suffice of itself to convince the court that it was not really entertained, and that the representation was a fraudulent one. So, too, although means of knowledge are, as was pointed out by Lord Blackburn in Brownlie v. Campbell, 5 App. Cas. 925, a very different thing from knowledge, if I thought that a person making a false statement had shut his eyes to the facts, or purposely abstained from inquiring into them, I should hold that honest belief was absent, and that he was just as fraudulent as if he had knowingly stated that which was false."

In such an action it is not essential to show that any benefit was derived from the deceit. Endsley v. Johns, 120 Ill. 479, 12 N. E. 247, 60 Am. Rep. 572; 2 Smith, Lead. Cas. pp. 1, 66; Implement Co. v. Chapman, 118 N. Y. 288, 23 N. E. 187. It need not be the sole inducement moving the plaintiff. Cook, Corp. § 355; Morgan v. Skiddy, 62 N. Y. 319. The plaintiff's action must, however, have been affected materially by the deceit. 118 N. Y. 288, 23 N. E. 187.

4. In respect of the defendant Sullivan, the vendor from whom plaintiff in error bought the shares in question, it is needless to say that, if he made false representations knowingly in respect of the capital of the insurance company to the plaintiff for the purpose of inducing him to buy shares in the company, he would be liable for the damages sustained, if the plaintiff acted in reliance on the truth of the statement. And this would be so whether the plaintiff bought shares from him or from another. Cook, Corp. § 355; Sigafus v. Porter, 28 C. C. A. 443, 84 Fed. 430; Hubbell v. Meigs, 50 N. Y. 480.

5. Upon each of the questions we have considered there was some evidence upon which the plaintiff was entitled to go to the jury. The judgment below must be reversed. It is accordingly ordered that the cause be remanded for a new trial upon principles not inconsistent with this opinion.