954

**STANDARD SURETY & CASUALTY CO. OF NEW YORK v. PLANTSVILLE NAT. BANK et al.**

Civil Action No. 1015.

District Court, D. Connecticut.

Nov. 9, 1945.

Neil Burkinshaw, of Washington, D. C., and C. J. Danaher, of Meriden, Conn., for plaintiff.

Joseph P. Cooney, of Hartford, Conn., and Harold L. Allen, of New York City, of counsel, for defendants.

HINCKS, District Judge.

This is a suit by the Standard Surety and Casualty Company of New York to recover

damages sustained as a result of the fraudulent misrepresentation by the Cashier of the Plantsville National Bank of the status of the account and credit of the Van Dyke Construction Company, for whom the plaintiff had been requested to write certain bonds. The defense rested chiefly on the contention that the misrepresentations were neither authorized by the defendant Bank nor relied upon by the plaintiff. The Statute of Limitations was invoked neither in the pleadings nor on trial.

### Findings of Fact.

1. Standard Surety and Casualty Company of New York is a corporation incorporated by and under the laws of the State of New York. The Plantsville National Bank of Plantsville, Connecticut, is in receivership and the Federal Deposit Insurance Corporation, a body corporate under the laws of the United States with its principal offices at Washington, D. C., is the receiver.

2. Standard was engaged in the business of executing surety bonds and guarantees. At the time of the transaction giving rise to this cause of action The Van Dyke Construction Company (hereinafter referred to as Van Dyke) was a corporation organized and existing under the laws of the State of New Jersey, and was engaged in the business of a construction contractor.

3. Prior to November 2, 1938, Van Dyke requested Standard to execute as surety certain bonds, guaranteeing, among other things, the performance of certain construction contracts and the payment of bills for labor and materials incurred in the performance of those contracts.

4. At the time that Van Dyke made application for those bonds it delivered to Standard a statement purporting to set forth the assets, liabilities and financial standing of Van Dyke, which indicated that it had on deposit with the Plantsville National Bank a cash balance of $53,455.60.

5. At the same time Van Dyke delivered to Standard a letter on the stationery of the Plantsville Bank signed by "E. L. Sullivan, Cashier," and dated August 23, 1938 which stated that Van Dyke had a balance on that date of $53,455.60, and had been granted a credit line in the amount of $150,000 by said bank. E. L. Sullivan was on that date cashier of the Plantsville Bank and the signature on the letter is genuine.

6. E. L. Sullivan was a stockholder of the Van Dyke Construction Company, owning 530 preferred shares out of 600 authorized. His ownership of common stock, if any, is unknown.

7. On November 2, 1938, Standard sent a letter addressed to the Plantsville National Bank requesting a confirmation of the $53,455 balance, and stating that it had been asked to execute certain contract bonds. Receiving no reply to this letter, Standard renewed its request by letter addressed to the Plantsville National Bank on November 15, 1938.

8. In reply to the second letter, Standard received a telegram confirming the balance, stating that a letter would follow, and signed "Plantsville National Bank." The telegram was sent on November 16, 1938 from Plantsville, Conn.

9. Subsequently, Standard received a letter on the stationery of the Plantsville Bank dated November 17, 1938, signed "M. L. Ensle, Asst. Cashier," and stating that Van Dyke had carried a "substantial account" for "the past two months," maintaining a balance of approximately $53,455.

10. Said signature on the letter of November 17, 1938, was in fact a forgery and was affixed thereto by E. L. Sullivan.

11. Under date of December 23, 1938, Standard executed for Van Dyke a performance bond in the sum of $115,644 to the Borough of Seaside Park, New Jersey.

12. Under date of January 24, 1939, Standard executed for Van Dyke a performance bond in the sum of $85,500 to the Board of Selectmen, Town of Claremont, New Hampshire.

13. In determining to execute these bonds, the officers of Standard relied primarily on the letters and telegram containing statements as to the deposit, but also considered Dun & Bradstreet reports, statements by Van Dyke as to financial standing included in the application for the bonds, and certain experience statements submitted to Standard by one John T. Ostheimer, a broker.

14. The Van Dyke Construction Company was not incorporated until September 1, 1938, and Standard's officers were aware of that fact when it executed the bonds referred to above.

15. John T. Ostheimer told Standard's officers that a group of men were forming a construction company. The assistant manager of Standard's Fidelity and Surety department, Howard G. Riley, who was on the committee which approved the indemnity contract bond, did not know that an unincorporated company could not open a corporate bank account and made no attempt to ascertain whether it could.

16. Riley noted that in the letter of November 17, 1938, the statement was made that Van Dyke had carried a substantial account with the Plantsville Bank for the past two months, and that the Bank's letter of August 23, 1938, confirmed a balance of substantially the same amount.

17. Riley knew at the time the bonds referred to above were executed that according to the 1938 edition of Rand & McNally's Bankers' Guide the capital and unimpaired surplus of the Plantsville Bank amounted to $58,000, that the amount of credit which a national bank could lawfully extend to a single customer was one-tenth of its unimpaired capital and surplus, and that a national bank could get another bank to write an amount in excess of that authorized, and he believed and relied on the statement that Van Dyke had been granted a credit line of $150,000 by the Plantsville Bank.

18. Nothing in the documents examined by Mr. Riley aroused suspicion on his part, since he relied on the statement purportedly signed by a National Bank.

19. The Van Dyke Construction Company never had in fact a deposit of $53,455.-60 or of any amount in the Plantsville Bank, and it had never been granted a credit line of $150,000 by said Bank.

20. Van Dyke thereafter defaulted in the performance of the construction contracts with the Borough of Seaside Park and the Town of Claremont, and failed to pay certain obligations for work, labor, services and materials.

21. Standard, in accordance with its bond, took over the contract not earlier than June, 1939, and completed the performance of the contract with the Borough of Seaside Park and satisfied the claims of that municipality for damages for failure of Van Dyke to complete its contract, and paid certain obligations incurred by Van Dyke. Standard did not perform any of the physical work of completion, but let a contract therefor first to the Titan Construction Corporation, which defaulted, and then to the Thomas Proctor Company, Inc.

22. Standard's net loss incurred in connection with the completion of the Seaside contract was $37,798.43 of which $6,827.41 was on account of its lawyers' fees.

23. Standard in accordance with its bond, completed the performance of the contract with the Town of Claremont, satisfied the claim of that municipality for damages for failure of Van Dyke to complete its contract, and paid certain obligations incurred by Van Dyke. Standard did not perform any of the physical work of completion, but let a contract therefor to Kuchar Brothers, Inc.

24. Standard's net loss incurred in connection with the completion of the Claremont contract was $21,597.13 of which $1,882.45 was on account of its lawyers' fees.

25. Contemporaneously with the execution of the performance bonds by Standard Van Dyke executed an indemnity agreement to indemnify Standard against any and all loss, liability, costs, damages, attorneys' fees, and expenses of whatever kind or nature sustained in consequence of executing these bonds.

### Conclusions of Law and Opinion.

1. The defendant is liable for damages arising out of any fraudulent misrepresentation made by its cashier while acting within the scope of his employment.

There can be little question as to this conclusion. Barnes v. Century Savings Bank, 165 Iowa 141, 144 N.W. 367; Rutherford v. Rideout Bank, 11 Cal.2d 479, 80 P.2d 978, 117 A.L.R. 383; Gleason v. Seaboard Air Line Ry. Co., 278 U.S. 349, 49 S.Ct. 161, 73 L.Ed. 415; 7 Am.Juris. Sec. 227, 232;

Zollman, Banks and Banking, Perm.Ed., Sec. 2302; Mechem on Agency, 2d Ed., 1914, Sec. 1987; Restatement of the Law of Agency, Sec. 258. The rule applies to statements made by a cashier within the apparent scope of his employment. Rutherford v. Rideout Bank, supra; Gosharn v. People's National Bank, 32 Ind.App. 428, 69 N.E. 185, 102 Am.St.Rep. 248; 7 Amer. Juris. Sec. 232; Zollman, Sec. 2413; Mechem, Sec. 1989; Restatement, Secs. 261, 262.

■ 2. When, in answer to inquiries addressed to the bank apparently at the suggestion of a customer, the cashier makes fraudulent misrepresentations as to the status of a customer's account and the credit that had been granted, the cashier is acting within the scope of his authority.

This is the general rule, Hindman v. First National Bank, 6 Cir., 112 F. 931, 57 L.R.A. 108, which applies even when the misrepresentation was made for the personal benefit of the cashier and without the knowledge of the defendant. Gleason v. Seaboard Airline Ry. Co., supra. See also Schott v. Bank of Elmore County, 62 Ohio App. 67, 22 N.E.2d 996, and People's State Bank v. Hill, 210 Ky. 222, 275 S.W. 694.

The many duties which the cashier of a national bank is authorized to perform are not exhaustively specified by law. He has greater inherent power than any other bank officer. 4 Michie, Banks and Banking, Perm.Ed., Sec. 8a.

"There are certain functions which by long and universal usage have come to be recognized as belonging to the office of cashier. They are declared to be inherent. in the office or position as a matter of law, and, unless restricted or enlarged, they, and they only, can be performed by him by virtue of his appointment." Taylor v. Commercial Bank, 174 N.Y. 181, 185, 66 N.E. 726, 727, 62 L.R.A. 783, 95 Am.St. Rep. 564. Cf. Zollman, Sec. 2411.

■ The practice of cashiers in making statements as to a customer's account to third persons referred to them for credit purposes by the customer is so well established that it has become a function belonging to the office of cashier. State-ments of that nature would seem to be within the actual or implied authority of the cashier. But if not, at least they are within the apparent scope of his employment.

■ "Banks hold out their cashiers to the public as having authority to act according to the general usage, practice, and course of business of the bank, and his acts within the scope of such usage, practice, and course of business will bind the bank in favor of third persons who possess no other knowledge." Zollman, Sec. 2414. The numerous cases which hold that a cashier acts outside the scope of his employment in giving investment advice or making representations as to the general financial standing of a customer or third person (Cf. First Nat. Bank of Manistee v. Marshall & Ilsley Bank, 6 Cir., 83 F. 725; Citizens Trust & Savings Bank v. Falligan, 9 Cir., 4 F.2d 481; Taylor v. Commercial Bank, supra; Martin v. Gotham National Bank, 248 N.Y. 313, 162 N.E. 91), are not applicable to the facts found here. For here the misrepresentation related to the alleged account of a customer and the state of his credit with the bank.

In such a case, the principles of the law of agency and a due regard for the principles of good business practice require that the bank should be holden for its cashier's fraud, if all other elements of the cause of action are proved.

■ 3. The plaintiff was entitled to rely on the representations made by the defendant's cashier.

To be sure, there were certain apparent inconsistencies between the misrepresentations and other data known to the plaintiff. How could Van Dyke have had an account in the Bank two months before its known date of incorporation? But Riley, the plaintiff's agent, did not know that an unincorporated company could not open a corporate bank account; in this as in other respects he relied on letters from the cashier of a national bank. He was not required to use ordinary care to protect himself from being defrauded unless he had the same access to the information as the person making the statement. Ford v. H. W. Dubiskie & Co., 105 Conn.

958

572, 136 A. 560; Gallon v. Burns, 92 Conn. 39, 101 A. 504. Manifestly, he had no such access in this case, and it may be noted that there was nothing to put the plaintiff or its agents on notice that Sullivan, the cashier, had any personal interest in Van Dyke.

■ 4. The plaintiff is entitled to recover only on proof of damage proximately resulting from the Bank's fraud and no such damage has been proved.

This principle is illustrated by the following cases: Boatmen's National Co. v. M. W. Elkins & Co., 8 Cir., 63 F.2d 214; Rachlin v. Libby-Owens-Ford Glass Co., 2 Cir., 96 F.2d 597; Morrell v. Wiley, 119 Conn. 578, 178 A. 121.

■ Here it is plain enough that at least one proximate cause of plaintiff's loss was Van Dyke's failure. But the proofs leave the cause of Van Dyke's failure completely veiled in mystery. Even with the finding that Van Dyke resorted to fraud which induced the plaintiff to go on its bond and with the conclusion that the Bank because of Sullivan's machinations must be deemed a party to that fraud, it does not necessarily follow that there was a causal relation between the fraud and the plaintiff's loss. For aught that appears the loss for which the plaintiff now seeks recovery may have been solely caused by unexpected losses accruing in the honest performance of the contracts underwritten by the plaintiff or of other projects undertaken by Van Dyke.

The situation comes to this. By the misrepresentations the plaintiff was induced to assume a position of liability in November, of somewhat greater hazard, obviously, than would have attached to its position if at that time Van Dyke in fact had had a cash deposit of $53,000 and enjoyed a substantial line of credit, as represented. Thus through the fraud the plaintiff's position, upon its execution of the bonds, was to some extent weaker than it had bargained for. But there is utterly no evidence to connect the fraud, or indeed the increased hazard of the plaintiff's position, with the plaintiff's payments made in the following June or thereafter to complete the contracts which the plaintiff, under its bond, was obligated to pay and did pay.

Even if Van Dyke had had cash and credit in November it does not follow, and neither the Bank nor its agent ever represented, that the cash and credit would be available some seven months later for the plaintiff's indemnification. The Bank's misrepresentation, made gratuitously, may not be stretched into a sweeping agreement to relieve the plaintiff of the entire risk which it assumed for a consideration.

5. The defendants are entitled to judgment with costs.