**STANDARD SURETY & CASUALTY CO. OF NEW YORK v. PLANTSVILLE NAT. BANK et al.**

No. 19, Docket 20202.

Circuit Court of Appeals, Second Circuit.

Dec. 4, 1946.

C. J. Danaher, of Meriden, Conn. (Neil Burkinshaw, of Washington, D. C., of counsel), for plaintiff-appellant.

Joseph P. Cooney, of Hartford, Conn. (Harold L. Allen, of New York City, and James M. Kane, of Chicago, Ill., and Irving H. Jurow, of Washington, D. C., of counsel), for defendants-appellees.

Before AUGUSTUS N. HAND, CHASE, and CLARK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The Van Dyke Construction Company (hereinafter called Van Dyke) was a corporation organized under the laws of New Jersey engaged in the business of a construction contractor. Prior to November 2, 1938, Van Dyke requested the plaintiff to execute bonds guaranteeing the performance of certain construction contracts and the payment of bills for labor and materials involved in the performance of those contracts. At the time Van Dyke applied for the bonds it delivered to the plaintiff a statement purporting to set forth the assets, liabilities and financial standing of Van Dyke which indicated that it had on deposit with the defendant Plantsville Bank a cash balance of $53,455.60. At the same time Van Dyke delivered to the plaintiff a letter on the stationery of the Plantsville Bank signed by "E. L. Sullivan Cashier." Sullivan was then the cashier of the bank and his signature was genuine. He also was a stockholder of Van Dyke, owning 530, out of 600, preferred shares. The letter was dated August 23, 1938, and stated that Van Dyke had a balance with the bank on that date of $53,455.60 and had been granted a credit line by the bank of $150,000.

On November 2, 1938, the plaintiff sent a letter to the bank requesting a confirmation of the $53,455 balance, to which it received no reply. The plaintiff renewed its request in another letter on November 15, 1938. On November 16, 1938 a telegram by the bank was received by the plaintiff confirming the balance, and subsequently the following letter:

"The Plantsville National Bank
"Plantsville, Conn.
"November 17, 1938
"Standard Surety & Casualty Company of New York,
"New York, N. Y.
"Gentlemen:
"Re: Van Dyke Construction Company
"7 East 44th Street, New York, N. Y.
"The above concern has carried a substantial account with us for the past two months, balances being maintained of approximately the amount of $53,455.00 mentioned in your letter of November 2.
"Very truly yours,
"M. L. Ensle,
"Asst. Cashier"

The signature "M. L. Ensle" on the foregoing letter was a forgery perpetrated by Sullivan, the cashier of the bank and the real writer of the letter.

Van Dyke did not in fact have a balance with the bank of $53,455.60 or of any amount whatever and it had never been granted by the bank a credit line of $150,000.

Under date of December 23, 1938 the plaintiff executed a performance bond for Van Dyke in the sum of $115,644 in favor of the Borough of Seaside Park, New Jersey, and under date of January 24, 1939, it executed a performance bond in favor of the Board of Selectmen, Town of Claremont, New Hampshire, in the sum of $85,500. Thereafter Van Dyke defaulted in the performance of those construction contracts and failed to pay certain obligations incurred for work, labor, services and materials.

The plaintiff, in accordance with its bond, took over Van Dyke's contract with the Borough of Seaside Park, completed performance of the contract and satisfied the claims of the municipality for damages arising from the failure to complete the contract and paid certain obligations incurred by Van Dyke, suffering thereby a

net loss of $37,798.43, of which $6,827.41 was on account of its lawyers' fees. Completion was accomplished through subcontractors.

The plaintiff likewise, in accordance with its bond, completed performance of Van Dyke's contract with the Town of Claremont, satisfied the claim of that municipality for damages and paid certain obligations incurred by Van Dyke. The net loss arising from the failure of Van Dyke to complete this contract was $21,597.13, of which $1,882.42 was on account of its lawyers' fees. The completion was carried out through a subcontractor.

Contemporaneously with the execution of the two performance bonds by plaintiff, Van Dyke executed an agreement to indemnify the plaintiff against any and all loss, liability, costs, damages and attorneys' fees of whatever kind or nature in consequence of executing the bonds.

The assistant manager of the plaintiff and a member of its underwriting committee testified that it relied on the representations as to the deposit with the bank and the line of credit in furnishing the bonds, and also said that the bonds would not have been written had it not been for the representations. There were submitted to the plaintiff on behalf of Van Dyke statements under date of October 10, 1938, to establish the latter's experience in general construction.

Examination of the application to the plaintiff by Van Dyke for a line of credit made in December 1938 listed as assets cash deposited in Plantsville Bank at $52,190; cash deposited in Irving Trust Company at $1,698; cash in the Van Dyke office at $50. The application listed as liabilities a note payable to the bank in the sum of $3,500 and a debt due for a bond premium of $455.-16. Inasmuch as the deposit with the Plantsville Bank was a fiction, Van Dyke was undertaking to perform contracts of more than $200,000 when its debts aggregated $3,955.16 as against only the deposit of $1,698 with the Irving Trust Company and $50 in cash.

The trial judge held that the cashier, when answering the inquiries addressed to the bank, was acting within the apparent scope of his authority and the defendant-bank would be liable for the cashier's misrepresentations if such misrepresentations were the proximate cause of damage. Hindman v. First Nat. Bank of Louisville, 6 Cir., 112 F. 931, 57 L.R.A. 108. In such circumstances the ignorance of the principal and the fact that the agent is engaged in a fraud either upon his principal or a third party will not avoid liability. Gleason v. Seaboard Air Line R. Co., 278 U.S. 349, 49 S.Ct. 161, 73 L.Ed. 415; Ricketts v. Pennsylvania R. Co., 2 Cir., 153 F.2d 757; Fifth Avenue Bank v. Forty-second Street & G. St. Ferry Co., 137 N.Y. 231, 33 N.E. 378, 19 L.R.A. 331, 33 Am.St.Rep. 712; Lloyd v. Grace Smith & Co. [1912] A. C. 716. Restat. Agency § 261 and § 262. The question in this case is whether the cashier in furnishing information as to the deposit of Van Dyke with his bank was acting within the apparent scope of his authority. It can make no difference whether the information is about the credit status with the bank of one who is actually a customer or of one who is represented to be a customer. The principles implicit in Gleason v. Seaboard Airline R. Co., 278 U.S. 349, 356, 357, 49 S.Ct. 161, 73 L.Ed. 415, equally apply to either situation. The person to whom the representation is made may not know whether it is true and yet will be justified in relying on statements by a bank official to whom inquiries as to the subject-matter are customarily addressed. Various decisions have refused to impute liability when fraudulent representations have been made as to the general financial standing of a customer, but in Hindman v. First Nat. Bank of Louisville, 6 Cir., 112 F. 931, 941, 57 L.R.A. 108, Judge Lurton distinguished between such representations and those regarding the relations of the customer to the bank for which the officer speaks. Cf. Rutherford v. Rideout Bank, 11 Cal.2d 479, 80 P.2d 978, 117 A.L.R. 383; Schott v. Bank of Elmore Co., 62 Ohio App. 67, 22 N.E.2d 996. While Van Dyke was represented to be a customer of the bank when it was not one, that fact, for the reasons we have given, can make no difference in the liability of the bank to third parties who are misled to their injury.

In spite of the fraudulent representations by the cashier of the bank upon which

the plaintiff was held to have been justified in relying, the trial court granted judgment for the defendants on the ground that there was no proof of damage proximately resulting from the bank's fraud. In disposing of the question of proximate cause the judge said in his opinion:

"Here it is plain enough that at least one proximate cause of plaintiff's loss was Van Dyke's failure. But the proofs leave the cause of Van Dyke's failure completely veiled in mystery. Even with the finding that Van Dyke resorted to fraud which induced the plaintiff to go on its bond and with the conclusion that the Bank because of Sullivan's machinations must be deemed a party to that fraud, it does not necessarily follow that there was a causal relation between the fraud and the plaintiff's loss. For aught that appears the loss for which the plaintiff now seeks recovery may have been solely caused by unexpected losses accruing in the honest performance of the contracts underwritten by the plaintiff or of other projects undertaken by Van Dyke.

"The situation comes to this. By the misrepresentations the plaintiff was induced to assume a position of liability in November, of somewhat greater hazard, obviously, than would have attached to its position if at that time Van Dyke in fact had had a cash deposit of $53,000.00 and enjoyed a substantial line of credit, as represented. Thus through the fraud the plaintiff's position, upon its execution of the bonds, was to some extent weaker than it had been bargained for. But there is utterly no evidence to connect the fraud, or indeed the increased hazard of the plaintiff's position, with the plaintiff's payments made in the following June or thereafter to complete the contracts which the plaintiff, under its bond, was obligated to pay and did pay.

"Even if Van Dyke had had cash and credit in November it does not follow, and neither the Bank nor its agent ever represented, that the cash and credit would be available some seven months later for the plaintiff's indemnification. The Bank's misrepresentation, made gratuitously, may not be stretched into a sweeping agreement to relieve the plaintiff of the entire risk which it assumed for a consideration."

It may be argued that the plaintiff made a prima facie showing of the bank's liability by offering testimony that Van Dyke was represented to it as having net quick assets equivalent to 20% of the total value of the two contracts, for such a financial condition would ordinarily indicate that the contracts could be successfully performed. But such an argument is not persuasive. The damages, if any, caused by the fraudulent misrepresentations would be the difference between the net amount the plaintiff was obliged to expend in connection with completion of the contracts and the dividends recoverable from Van Dyke. We know nothing about the assets of Van Dyke when it defaulted, or about its liabilities, except that it then owed a total of $50,919.94 on the two contracts which the plaintiff was obliged to pay. We do not know what other obligations it had and whether, if it had had deposits of $53,455.60 in December 1938, as was represented, the loss incurred by the Surety Company would not have been as great as it proved to be finally. Apparently it would have been as great.

It is true that the charter of Van Dyke has been revoked for non-payment of taxes and that its books and officers have disappeared. This makes accurate computations impossible. But, if we assume that in December 1938 Van Dyke had had a deposit of $53,455.60 in the defendant-bank, the loss of the plaintiff would apparently have been no less than it proved to be, for the $53,455.60 would doubtless have been dissipated prior to the time of default either in connection with the Seaside and Claremont or other contracts. As it turned out, a loss of $135,895.56 was suffered on Seaside and Claremont by those who completed those contracts as appears from the following items:

| On Seaside Contract— | |
|---|---|
| Net loss suffered by plaintiff | $ 37,798.43 |
| Amount paid by National Surety Company, underwriter on contract of Titan Construction Company | 76,500.00 |
| On Claremont Contract— | 21,597.13 |
| Total | $135,895.56 |

**426**

It is apparent from the foregoing that without taking into account anything but the Seaside and Claremont contracts which are the only ones regarding which we have any details, the condition confronting Van Dyke in December 1938 was one of almost inevitable insolvency and necessary default irrespective of whether its assets had in December 1938 been increased by $53,455.60 or not. Plaintiff would never have been able to avoid full liability on its bond had it completed the contract itself. By obtaining a surety for Titan that performed the Seaside contract at a loss of $76,500 when Titan proved financially unable to do so the plaintiff only minimized its own loss pro tanto.

If the bank had furnished a line of credit to Van Dyke of $150,000 we cannot see that the plaintiff would have suffered a smaller loss than it has done. Whatever addition there would have been to the assets of Van Dyke from such a credit would necessarily have been offset by a debit of an equal amount. To say that such a financial arrangement would have affected the final result would be to indulge in mere speculation and to rely on something so unsubstantial that it would not justify a finding for the plaintiff and certainly could not establish that the finding of the trial judge that there was no adequate proof of damages caused by the representations of the defendant-bank was clearly erroneous.

Moreover there were other contracts undertaken by Van Dyke than those with Seaside and Claremont, of which we have not the financial details and which might account for plaintiff's loss. Had the putative deposit of $53,455.60 existed in December 1938 it might have been entirely dissipated in carrying out those contracts and in meeting expenses of overhead. We agree with the trial judge that the attribution of the plaintiff's losses to the absence of the deposit in the defendant-bank rests upon too slender a foundation to justify the imposition of any liability.

Judgment affirmed.